# EXHIBIT 3

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

ALL MATTERS RELATED TO NORTH
AMERICAN REFRACTORIES
COMPANY, et al. in Case No. 02-20198, as
affected by the May 24, 2013 Order
Entering Final Decree entered at Doc. No.
7940,

     Debtors.


HONEYWELL INTERNATIONAL INC.,

          Plaintiff,

   v.

NORTH AMERICAN REFRACTORIES
COMPANY ASBESTOS PERSONAL
INJURY SETTLEMENT TRUST,

        Defendant.

Misc. Case No. 15-00204 TPA

Adversary Proceeding No. 21-02097 TPA

Related to Document No. 2


## COMPLAINT

# **TABLE OF CONTENTS**

**Page**

I. NATURE OF THE ACTION ................................................................. 1

II. THE PARTIES ................................................................................... 9

III. JURISDICTION AND VENUE ......................................................... 9

IV. THE NARCO BANKRUPTCY AND § 524(G) TRUST ..................... 11

    A.    Background on the NARCO Chapter 11 Proceedings ......................... 11

    B.    The "Evergreen" Trust Arrangement and Honeywell's Funding of the Trust ............................................................................................ 12

    C.    Honeywell's Oversight and Audit Powers and Rights of Consent ....... 14

    D.    The Trust's Obligation to Fund Only "Valid" Claims Under the Stringent TDP Requirements .......................................................... 15

    E.    Expedited and Individual Review ...................................................... 18

V. THE TRUST'S BREACHES OF THE TRUST AGREEMENT, THE TDP, AND THE STIPULATION AND ORDER .................................. 19

    A.    The Trust's Reversal of its Prohibitions on the Use of Form and Check-the-Box Affidavits Violates the TDP .................................... 21

            *i.    The Trust Previously Admitted that Form and Check-The-Box Affidavits Are Deficient* ............................................ 26

            *ii.    The Trust Later Reversed its Policies and February 2016 Directives Relating to Form and Check-the-Box Affidavits and Affidavits That Merely Parrot the Exposure Standard of the TDP* ...... 28

    B.    The Trust Also Re-Implemented the Refractory Inference, in Violation of the Stipulation and Order ............................................ 31

    C.    Material Inconsistencies in Claimants' Submissions Underscore the Dangers In Relying on Form and Check-the-Box Affidavits and on Blanket Refractory Inferences and/or Parroting Statements in Affidavits ...... 34

    D.    The Trust "Audit" ............................................................................. 39

    E.    The Expansion of Presumptive NARCO Inference to Non-Presumptive Industries ...................................................................... 42

i

F.    The Trust's Individual Review Model is a Breach of the Trust
Agreement and TDP, and Also Constitutes an Abuse of Discretion ............................... 45

G.    The Trust Violated the TDP and Trust Agreement When It
Unilaterally Extended the Statute of Limitations for Claimants Despite
Honeywell's Objection and Without Honeywell's Consent ............................................ 47

H.    The Trust Is Mismanaging Trust Assets and Engaging in Wasteful
Spending ........................................................................................................................ 50

COUNT 1 Breach of Trust Agreement and TDP - Improper Reversal of
Policies on Form and Check-the-Box Affidavits and Parroting of the TDP ................... 53

COUNT II Breach of the Stipulation and Order - Reinstitution of the
Blanket Refractory Inference ............................................................................................. 54

COUNT III Breach of Trust Agreement and TDP - Acceptance of
Exposure Evidence Containing Material Inconsistencies.................................................. 55

COUNT IV Breach of Trust Agreement and TDP - IR Model.......................................... 56

COUNT V Breach of Trust Agreement and TDP - Expansion of
Presumptive NARCO Inference to Non-Presumptive Industries ...................................... 57

COUNT VI Breach of Trust Agreement and TDP - Extension of the
Statute of Limitations........................................................................................................ 59

COUNT VII Breach of Trust Agreement and TDP  - Misuse of Trust
Funds .............................................................................................................................. 59

COUNT VIII Declaratory Judgment ................................................................................. 61

PRAYER FOR RELIEF ........................................................................................................ 62

Honeywell International Inc. ("Honeywell") files this Complaint against the North

American Refractories Company Asbestos Personal Injury Settlement Trust (the "Trust" or

"NARCO Trust"), and alleges as follows:

# I.
# NATURE OF THE ACTION

1.      This Complaint seeks to rectify severe and abusive mismanagement of an

asbestos bankruptcy trust that was created to deliver recovery to individuals who make "valid"

claims, supported by "competent" and "credible" evidence demonstrating that they were exposed

on a "regular basis" to asbestos-containing products manufactured, sold or distributed by

NARCO.  Rather than deliver on that worthwhile goal, the Trust has squandered its assets, paid

claimants who have not demonstrated the requisite exposure, and generally breached its duties in

managing the Trust.  The Trust, which to date has been directed by the same three trustees for

over eight years, has violated a Stipulation "so ordered" by this Court in March 2016;  reneged

on commitments it made to Honeywell and this Court in the course of a preliminary injunction

hearing in August 2015;  repeatedly breached the governing Trust Agreement and Trust

Distribution Procedures;  and incurred annual administrative expenses (mostly on lawyers,

payments to the Trustees, and to one Trustee's own consulting firm) that dramatically exceed

amounts that other similar asbestos trusts typically incur.

## *Formation and Structure of the Trust*

2.      In 2007, this Court approved the formation of a unique § 524(g) trust as part of

the long-ago confirmed and consummated plan of reorganization for the North American

Refractories Company ("NARCO").  Honeywell funds the NARCO Trust on an "evergreen"

basis, obligating Honeywell to pay all valid claims subject to a nine-figure annual – but no

lifetime - cap.

1

3.      Due to Honeywell's continuing funding obligations, the Trust Agreement and

Trust Distribution Procedures ("TDP") give Honeywell enhanced oversight in how the Trust is

administered.  As this Court has explained, Honeywell's ongoing duty to fund the Trust "serves

as a basis for Honeywell to have a continuing interest in how the Trust is being operated."

12/16/15 Order at 5, Misc. Case No. 15-00204-TPA (Dkt. 265).

4.      The Trust must follow the strict agreed-to requirements set forth under the Trust

Agreement and the TDP for establishing that a claim is "valid."  The Trust has repeatedly

breached that obligation.

### *The Previous Litigation*

5.      Six years ago, Honeywell was forced to come to this Court to require the Trust to

adhere to the strict exposure requirements for establishing a valid claim under the Trust

Agreement and TDP.  Among other things, Honeywell sought to enjoin the Trust from paying

claimants based on affidavits that relied on formulaic exposure language contained in pre-

printed, boilerplate "form" affidavits, or that similarly used a non-individualized "check-the-

box" format.  Additionally, Honeywell sought to enjoin the Trust from relying on a blanket

"refractory inference," through which the Trust improperly presumed that all claimants exposed

to *any* refractory products on an approved work site must have been exposed to specific NARCO

asbestos-containing products on a regular basis, which is the requisite exposure standard set forth

in the TDP.

6.      These pre-printed, one-size-fits-all affidavits are improper and not credible on

their face.  Quite obviously, thousands of claimants represented by the same law firm cannot

have had the exact same recollections about how they were exposed and the exact same

exposures - especially when they worked at different worksites, in different jobs, at different

times, in different industries, and with different products.

2

7.      In the previous litigation, and during a three-day evidentiary hearing in August

2015 (the "Hearing"), Trust representatives ultimately admitted that form and check-the-box

affidavits were deficient and should not be accepted.

8.      The Trust committed to the Court (and to Honeywell) that it would no longer

accept form or check-the-box exposure affidavits and would "instead issue[] deficiency notices"

to such claimants.  In December 2015, the Court issued an order that memorialized the Trust's

"voluntary agreement to stop accepting certain 'check the box' or 'form' affidavits as sufficient

to support a claim."  12/16/15 Order at 10, Misc. Case No. 15-00204-TPA (Dkt. 265).

9.      At the closing argument, in November 2015, the Court commended the Trust for

putting an end to the refractory inference. The Court said "Now here's what I'm leaving - here's

the impression, and you correct me if I'm wrong.  The refractory inference is by the board.

Standing alone as a means to an end is gone, okay, and I think -- I applaud you, I applaud the

Trust for doing that."   Nov. 23, 2015 Tr., at 149:4-149:8.    Shortly thereafter, following some

additional encouragement from this Court, the Trust stipulated, which was "so ordered" by this

Court, that it "will not, as a matter of blanket policy, accept a bare assertion that the claimant

worked around refractory products as sufficient to meet the exposure standard under the" TDP

(the "Stipulation and Order").  *Stipulation and Order*, No. 15-00204-TPA [Doc. No. 376]

(Bankr. W.D. Pa. Mar. 17, 2016).

10.     The Hearing, the Court's helpful guidance during it, and the Stipulation and

Order, put the Trust on a path that better aligned the Trust's claims-processing standards with the

TDP's strict exposure requirements.  In February 2016 - more than two years after the Trust

began processing claims - the Trust (finally) adopted a set of written directives (the "February

2016 Directives") for its claims processor to implement the TDP's NARCO exposure

requirements.  In the February 2016 Directives, the Trust expressly acknowledged that form and check-the-box affidavits "represent evidence that raise[] competence and/or credibility concerns."  In fact, echoing these February 2016 Directives, in a letter dated March 11, 2016 the Trust's general outside counsel explained that "[i]n the form [affidavit] context, the concern is that claimants blindly will sign affidavits without personalization."

11.    Following these developments, the litigation was discontinued by Honeywell without prejudice and the parties proceeded to mediate their remaining differences before Hon. Judith Fitzgerald.  That mediation, however, failed to lead to any lasting agreements of relevance to this Complaint.

### *The Trust Reverts to its Previous Improper Practices*

12.    The Trust has regrettably returned to its old ways.  In violation of the Trust Agreement and TDP, and the Stipulation and Order, the Trust is once again paying claims based on form and check-the-box affidavits.  The Trust has now paid thousands of claims, valued at tens of millions of dollars, in reliance on form exposure affidavits - in many cases, the *same* form affidavits that were at issue in the Hearing.  The Trust reversed its prohibitions on form affidavits despite Honeywell's providing the Trust with evidence that many form affidavits contained exposure allegations that were inconsistent with exposure allegations the same claimants previously made to the Trust and/or made in tort proceedings.

13.    In the Fall of 2017, Honeywell provided the Trust with over 100 examples of claims containing key inconsistencies in the form affidavits submitted to the Trust, as compared to prior testimony the same affiants provided in the tort system and/or in subsequent affidavits these same affiants had provided to the Trust.  In each case, the same law firm that submitted the claim to the Trust also represented the affiant in the tort system.

4

14.     The Trust asked its auditor to audit the law firms that submitted the inconsistent affidavits, but the Trust refused Honeywell's suggestion to wait for that audit's findings before reversing its prohibition on form affidavits.  The Trust reversed its prohibition anyway, reflecting a serious failure to engage in informed decision-making.

15.     Form and check-the-box affidavits are no more "credible" or "competent" today than they were six years ago when the matter was previously before this Court.  The Trust reversed these prohibitions after telling Honeywell and the other Trust constituents at a meeting in December 2017 that, in its view, not enough claimants were getting paid (without regard to the validity of such claims).  Such outcome-driven decision-making is precisely what forced Honeywell to bring its original complaint in 2015.

16.     This policy reversal meant that many form and check-the-box affidavits of the type that were on file with the Trust at the time of the Hearing - which the Trust had represented to this Court would be deemed "deficient" - are again being accepted as eligible for payment and being used to support payment of tens of millions of dollars of claims.

17.     In 2018 and early 2019, Honeywell provided the Trust with approximately 1,500 additional examples of inconsistent affidavits in its ongoing effort to show the Trust why its policy changes violate the TDP and why form and check-the-box affidavits are unreliable.

18.     The Trust has refused to return to the February 2016 Directives (which prohibited reliance on affidavits that were recognized as form affidavits at the time), and thereby live by the promises it made to Honeywell and this Court.

19.     The Trust has also since re-implemented the same refractory inference that was one of the main subjects of the Hearing in 2015 and the subject of the Stipulation and Order.  On December 23, 2020, Honeywell sent a letter to the Trust detailing this violation. When it finally

responded, the Trust, on the one hand, denied (as it did after the Hearing) that it was using a blanket

refractory inference at all, but on the other hand, acknowledged that the refractory inference that

Honeywell complained about is reflected in a January 2019 worksheet the Trust created for its

claims processor to use in processing claims. Per the Trust's letter, the Trust worksheet directs the

claims processor to approve exposure allegations for claimants who worked on approved sites if

they "show exposure to one or more asbestos-containing products of the same types [*i.e.*, refractory

products] as NACPs" (*i.e.*, NARCO asbestos-containing products). This is in clear violation of

the Stipulation and Order, which barred the Trust from "accept[ing] a bare assertion that the

Claimant worked around refractory products as sufficient to meet the exposure standard under the

[TDP]."

20.      Based on the statements in the Trust letter to Honeywell and the conduct of the

claims processors following the implementation of that new worksheet directive, it is clear that the

January 2019 worksheet had the purpose or effect of re-instituting the same refractory inference

that was the subject of the Hearing. Indeed, 25% of claims paid by the Trust in Q3 2020, Q4 2020

and Q1 2021 had exposure affidavits that did not mention NARCO and/or NARCO asbestos-

containing products. Rather, in violation of the Stipulation and Order, the Trust paid them based

on their "bare assertions that the claimant worked around refractory products." *Stipulation and

Order*, No. 15-00204-TPA [Doc. No. 376] (Bankr. W.D. Pa. Mar. 17, 2016).

21.      The Trust's maladministration also extends to the model it created to value so-

called "Individual Review" or "IR" claims - claims that are subject to heightened scrutiny by the

TDP but with the possibility of heightened compensation. Under the TDP, these claims are only

available for persons with "extenuating circumstances." The Trust's IR Model fails to meet that

and other criteria of the TDP.

### *The Trust's Gross Mismanagement of Assets*

22.     The Trustees are also misusing Trust assets through wasteful spending and self-dealing.  For the three years ending December 31, 2020, the Trust's self-described "non-litigation" spend for administrative operations (*i.e.*, excluding indemnity payments to claimants) has averaged more than $16 million per year.  That is multiples higher than other § 524(g) trusts, which in 2018 and 2019 averaged in the $3 million range.  Unlike these other trusts, however, the administrative budget of the NARCO Trust does not get funded from a finite pool of funds.  Honeywell must fund the Trust's entire administrative expenses separately (*i.e.*, not through a pool of funds that would otherwise be available to pay claimants), which gives the Trustees little incentive to spend prudently - to Honeywell's detriment.

23.     The Trust has in particular failed to manage its "special" litigation counsel, whose fees Honeywell must also fund (even though there has been no litigation for years).  The Trust employs an army of lawyers and imposes no effective controls on their work or their rates.  The Trust has spent on its "special" litigation counsel from 2018-2020 in excess of $11 million, notwithstanding there was no pending litigation or arbitration during that period.  That amount is *in addition to* the $11.8 million the Trust spent during that same period on its regular outside counsel.  All of these fees, along with the fees of the Trust's consultants, have been paid by Honeywell.

24.     As further evidence of Trust mismanagement of its legal spend, the Trust consistently has five to seven lawyers (all partners) attend routine weekly Trust meetings (including several of its special litigation partners).  Some of these partners have billing rates approaching or exceeding $1,500 per hour.  Honeywell has consistently objected to this practice as well, but to no avail.

7

25.    Also over Honeywell's continued objection, the Trust has for years been paying

nearly $100,000 per month to *the consulting firm owned by and named after one of the Trustees*

for the use of just two of its consultants.  These consultants perform day-to-day work for the

Trust that can and should be done at much cheaper rates by full-time Trust staff employees.

Through May 2021, this Trustee's consulting firm has received approximately $5.5 million in

payments from the Trust for the services of these two consultants.  This is in addition to the

several millions of dollars the Trustee himself has received for his service as a Trustee.

### *Recent Efforts To Address Honeywell's Concerns*

26.    Nearly three years ago, Honeywell threatened to bring a lawsuit based on the

various issues cited above.  In fact, it provided the Trust with a copy of the complaint it was on

the verge of filing.  This precipitated settlement discussions, which soon morphed into what

ended up becoming a protracted discussion between Honeywell and the Trust Advisory

Committee (the "TAC") aimed at a potential restructuring of the Trust arrangement to bring an

end to this and any other disputes.  By September 2020, the TAC and Honeywell had made

substantial progress on a potential deal, which the parties promptly sent to the Trust for its

review along with detailed draft settlement agreements.  The Trust demanded that Honeywell

advance millions in fees and expenses before the Trust would even mark-up the draft agreements

and thereafter dragged its feet for almost a full year, raising concerns that the Trust was not

negotiating in good faith.  As a result, Honeywell was left with no choice but to file this lawsuit

in order to bring to an end the Trust's continued violations of the TDP, the Stipulation and Order,

and its gross mismanagement of assets. The Trust requires judicial intervention.

27.    For these reasons and those that follow, Honeywell requests that the Court grant

Honeywell the relief requested herein, including determinations that the Trust is breaching the

Trust Agreement and TDP, violating the Stipulation and Order, and/or abusing its discretion.

## II.
## THE PARTIES

28.     Plaintiff Honeywell International Inc. is the predecessor in interest to NARCO,

the Chapter 11 debtor in this case.  NARCO was a manufacturer and distributor of "refractory

products," which are construction materials used in products such as specialty bricks, mortar,

concrete-like mixes, and cement used in lining the exteriors of furnaces and boilers.  NARCO's

refractory products primarily were used in certain high-heat operations, like steel, glass, and

aluminum manufacturing processes.  Only a tiny fraction of NARCO's refractory products

contained asbestos.  Approximately 98.5% of NARCO's refractory products contained no

asbestos - ever.  Honeywell is a settlor of the Trust at issue in this Complaint.

29.     Defendant NARCO Asbestos Personal Injury Settlement Trust is a bankruptcy

trust created pursuant to 11 U.S.C. § 524(g), to fund the claims of persons who claim injury due

to exposure to NARCO asbestos-containing products.  Mark M. Gleason, Ken M. Kawaichi, and

Richard B. Schiro have been the only Trustees of the Trust for over eight years now, *i.e.*, since

its inception.

## III.
## JURISDICTION AND VENUE

30.     This Court has jurisdiction to hear the matters in the above-captioned adversary

proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

31.     This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).

32.     In addition, pursuant to the Order Entering Final Decree Closing Certain

Chapter 11 Cases, No. 02-20198-TPA [Doc. No. 7940] (Bankr. W.D. Pa. May 24, 2013), this

Court retained jurisdiction to "enforce the terms and conditions of the Plans (including all related

9

documents contemplated by the Plans)," which include the TDP and the First Amended NARCO

Trust Agreement, dated April 30, 2013 (as amended, the "Trust Agreement").

33.     On January 29, 2016, this Court acknowledged that matters such as the ones

pleaded in this Complaint "affect[] the interpretation, implementation, consummation, execution

or administration of a confirmed plan or an incorporated trust agreement" and, as such, satisfy

the "'close nexus' test" to establish subject matter jurisdiction and are core matters.  (Doc. 305,

Order, dated Jan. 29, 2016.)

34.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

35.     This adversary proceeding has been brought in accordance with Bankruptcy

Rules 7001(7) and (9).

36.     Pursuant to Federal Bankruptcy Rule of Procedure 7008, Honeywell consents to

the entry of a final order or judgment by the Bankruptcy Court.

37.     Section 8.14 of the Trust Agreement provides that "[a]ny disputes that arise under

the [Trust Agreement] or under the NARCO Asbestos TDP . . . shall be resolved by submission

of the matter to an [ADR] process mutually agreeable to the Parties involved.  Any Party to the

ADR process dissatisfied with the decision of the arbitrator(s) may apply to the Bankruptcy

Court for a judicial determination of the matter."  Section 8.14 also provides "if the dispute is not

resolved by the ADR process within thirty (30) days after submission, the Parties are relieved of

the requirement to pursue ADR prior to application to the Bankruptcy Court."

38.     From April 2016 through October 12, 2017, the parties unsuccessfully engaged in

an ADR (mediation and arbitration) process before Hon. Judith Fitzgerald pursuant to a certain

Standstill Agreement executed on April 12, 2016 (the "Standstill Agreement").  The Standstill

Agreement expired on October 12, 2017, and the parties' subsequent efforts to settle their

disputes proved fruitless.  Honeywell has thus satisfied the ADR requirement set forth in Section 8.14 of the Trust Agreement.

39.    Honeywell's Complaint takes issue only with the Trust's policies and procedures in the almost four years since the Standstill Agreement expired on October 12, 2017, as nothing in that Agreement or the ADR process controls the Trust's discretionary conduct after expiration of the Standstill Agreement.

## IV.
## THE NARCO BANKRUPTCY AND § 524(G) TRUST

### A.    Background on the NARCO Chapter 11 Proceedings

40.    NARCO manufactured more than 2,000 different refractory products. Approximately 30 of those products (less than 1.5%) contained asbestos as an intended ingredient.  Of these few products, asbestos comprised only a very small portion of the product. In 1980, NARCO stopped adding even that small amount of asbestos to any of its products. Accordingly, only individuals with exposure to a small subset of products manufactured in certain years could possibly have claims against NARCO.

41.    In 1979, Honeywell effectively became the parent of NARCO.  In 1986, Honeywell spun off and sold NARCO to a group of investors.

42.    On January 4, 2002, NARCO filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code at Case No. 02-20198-TPA.

43.    On November 13, 2007, this Court entered an order [Doc. No. 5508] confirming the Third Amended Plan of Reorganization of North American Refractories Company, *et al.*, dated December 28, 2006 [Doc. No. 3889], which included the Trust Agreement and TDP.

44.    The Trust Agreement was executed by all constituents, including:  (a) the Trust "settlors"-*i.e.*, Honeywell;  ANH Refractories Company (the NARCO-successor entity that

11

emerged from the Chapter 11 bankruptcy proceedings, now known as HarbisonWalker International ("Harbison Walker"));   and NARCO;  (b) the three Trustees of the Trust (Richard B. Schiro, Mark M. Gleason, and Ken M. Kawaichi);  (c) members of the NARCO Trust Advisory Committee (TAC);  and (d) the NARCO Future Claimant's Representative (FCR) Lawrence Fitzpatrick.

45.     The Trust became effective on April 30, 2013.

46.     The Trustees are obligated to operate the Trust in accordance with the Trust Agreement and TDP, and must act as fiduciaries to the Trust.

47.     On May 24, 2013, this Court entered the Final Decree [Doc. No. 7940], and these Chapter 11 cases were closed [Doc. No. 7941].

48.     Upon consummation of the Plan and pursuant to 11 U.S.C. § 524(g), all present and future NARCO asbestos-related claims against NARCO and Honeywell were channeled to the Trust.

**B.     The "Evergreen" Trust Arrangement and Honeywell's Funding of the Trust**

49.     Since NARCO's bankruptcy filing, Honeywell has paid approximately $2.3 billion to holders of NARCO claims, and is obligated to continue funding the Trust in perpetuity. As this Court has recognized, Honeywell's ongoing funding obligations make this a "unique, or at least highly unusual" § 524(g) trust and give Honeywell a "continuing interest" in how the Trust is operated.  12/16/15 Order at 5, Misc. Case No. 15-00204-TPA (Dkt. 265).

50.     Specifically, per the Trust Agreement, Honeywell is obligated to fund in perpetuity all appropriate distributions made by the NARCO Trust for valid asbestos claims, up to certain annually capped amounts (in excess of $100 million), subject to certain limitations and exceptions.  Trust Agreement § 2.3(b), (c).  Honeywell will fund the Trust until there are no

12

more valid claims to be paid (or until some other enumerated termination event arises).  The

Trust may receive and pay claims for the next several decades.

51.     In addition to funding asbestos claims, Honeywell must also fund the Trust's

annual administrative budget, which includes its reasonable administrative costs, reasonable

legal fees (including for litigation), and reasonable operating expenses.  Trust Agreement § 2.3.

52.     From the effective date of the Trust through August 2021, the Trust has paid

claimants approximately $523 million, which includes:  (i) over $128 million in "liquidated

Pre-Established Claims" that were approved by Honeywell;  (ii) an additional $16 million in

"unliquidated Pre-Established Claims" that were approved by the Trust (and funded by

Honeywell);  and (iii) over $379 million in "Annual Contribution Claims," defined in § 4.1 of the

TDP as all claims that are not Pre-Established Claims (the "ACC claims").  Prior to November

2019, ACC claims payments made by the Trust to claimants came from dividends paid to the

Trust by HarbisonWalker.  Per the Trust Agreement, Honeywell is the beneficiary of those

dividends, as they serve to reduce Honeywell's payment obligations dollar-for-dollar.  Since

November 2019, however, payments made by the Trust to claimants for ACC claims (totaling

over $190 million) have come entirely from Honeywell's funding of the Trust, as the Trust had

by then fully paid out to claimants all monies it had previously received in dividends from

HarbisonWalker[1].

53.     Honeywell paid approximately $1.8 billion in settlement after NARCO filed for

bankruptcy but before the Trust became effective (*i.e.*, post-petition settlements).  Including

---

[1] The Trust just received a dividend from HWI for the first time in years in July 2021, and used some portion of that
to pay some claimants in August 2021. The standard report that the Trust provides to Honeywell with the details of
the paid claimants has not been provided by the Trust yet.

these payments, Honeywell has now paid directly or, indirectly through funding of the Trust,

approximately $2.3 billion to NARCO claimants.

54.     In addition to Trust payments to claimants themselves (*i.e.*, approximately $523

million), Honeywell has paid the Trust more than $140 million in administrative expenses

(including legal expenses) since the effective date of the Trust through the date of this

Complaint.

55.     From 2017 through 2020 alone, Honeywell paid approximately $75 million for

Trust administrative expenses while the Trust paid approximately $210 million in claims.  That

is, the Trust incurred a disproportionally high 36 cents in administrative costs for every $1.00

paid to claimants.

### C.     Honeywell's Oversight and Audit Powers and Rights of Consent

56.     Due to the evergreen nature of the Trust, the Trust Agreement and TDP give

Honeywell broad oversight and audit powers with respect to its administration and operations.

57.     Indeed, this Court previously observed that "I can't see a broader scope audit

right - created by any other document than the one that's in play here."  (Jan. 28, 2016 Hr'g Tr.

15:13-18.)

58.     Section 8.4 of the Trust Agreement provides that "[n]o amendment to this

NARCO Asbestos Trust Agreement, the NARCO Asbestos TDP, or the Trust Bylaws may be

made that will in any manner increase the amount of Honeywell's funding obligation to the

NARCO Asbestos Trust (either to the Trust Expense Fund, the Annual Contribution Claims

Fund, or the Pre-Established Claims Fund) without Honeywell's consent, *which Honeywell may*

*withhold in its sole and exclusive discretion*."  (emphasis added.)   Thus, in instances where the

change would increase Honeywell's funding obligation to the Trust, Honeywell's refusal to

consent to the change is final and non-reviewable.

14

59.     These and other provisions of the Trust Agreement and TDP underscore Honeywell's right to monitor, and in some cases, approve the Trust's activities to ensure that Honeywell's payments to the Trust are being properly deployed and not wasted.

**D.     The Trust's Obligation to Fund Only "Valid" Claims Under the Stringent TDP Requirements**

60.     The Trust Agreement and TDP govern the operation of the Trust and set the standard for what constitutes a "valid" claim for compensation for an injury related to a NARCO asbestos-containing product.

61.     The Trust Agreement makes clear that the Trust may pay only "valid" claims.  A stated purpose of the Trust is to "pay all *valid* NARCO Asbestos Trust Claims and NARCO Asbestos Demands."  (emphasis added.)  Other provisions of the Trust Agreement, such as Sections 2.2, 2.3, and 3.5(a), likewise emphasize the Trust's duty to pay only "valid" claims. Section 3.2 of the Trust Agreement requires the Trustees to operate in accordance with these provisions as well as with the TDP.

62.     What qualifies as a "valid" claim is spelled out in detail in the TDP:  a claimant must meet, among other things, certain specifically enumerated medical and exposure criteria and must provide "competent" and "credible" evidence that he or she was exposed "on a regular basis" to a "specific asbestos-containing product manufactured, sold or distributed by NARCO."

63.     To do this, a "claimant must submit requisite evidence of exposure to a specific asbestos-containing product manufactured, sold or distributed by NARCO or its predecessors, which includes demonstrating both the *presence* of such products at a particular site at a particular time and the claimant's occupational *exposure* to that product."  TDP § 4.7(b)(1) (emphasis added); *see also* TDP § 4.3(a)(3).

64.    Accordingly, a claimant must show with "competent" and "credible" evidence that he worked at a site where a NARCO asbestos-containing product was "present" (the so-called "Presence Prong") *and* that he was "exposed" to a NARCO asbestos-containing product on a regular basis (the so-called "Exposure Prong").

65.    To establish the Presence Prong, a claimant must produce "competent" and "credible" evidence showing that the claimant worked at a worksite where NARCO asbestos-containing products were present.  TDP § 4.7(b)(1).  "Presence" can be established in one of two main ways.

66.    First, if a claimant demonstrates that he/she worked at an approved worksite (hereinafter, an "Approved Worksite") during a designated time frame for which the site is approved, then the Presence Prong is deemed satisfied per the TDP.  There are nearly 900 Approved Worksites that were agreed to among the Trust constituents, and each one is listed in an Attachment to the TDP and on the NARCO Trust website, along with the designated time frames.

67.    Second, if the claimant did not work at one of those Approved Worksites (and/or worked at them but not during the designated timeframe), then the TDP's Presence Prong "presumption" will not apply.  In that event, the claimant must establish the presence of a "specific" NARCO asbestos-containing product through other proof that is "competent" and "credible."  TDP § 4.7(b)(1).

68.    No matter how "presence" is established - whether by a TDP-authorized "worksite" presumption or by independent, separate evidence - a claimant must still establish the second prong of the TDP's exposure requirement, namely, the "claimant's occupational exposure" to a NARCO asbestos-containing product (*i.e.*, the Exposure Prong).  Thus, the

claimant must establish not only presence of a NARCO product, but also that claimant's specific exposure to that product.

69.     As to the Exposure Prong, as Trustees Schiro and Gleason each acknowledged during the Hearing that the mere presence of a NARCO asbestos-containing product at the claimant's worksite is *not* enough to establish that the claimant was actually exposed to the NARCO asbestos-containing product - let alone exposed on the requisite "regular basis."  Schiro, 8/3/15 Tr. 251:19-252:7; Gleason, 8/5/15 Tr. 110:23-111:6.

70.     As the TDP provides:  "In order to demonstrate exposure to the NARCO asbestos-containing product at the relevant site, a claimant must submit competent evidence that he or she worked on *a regular basis* with the NARCO asbestos-containing product or worked on a regular basis *in close proximity* to workers engaged in the activities set forth in Section 4.7(b)(2)(a) through (c)."  TDP § 4.7(b)(1) (emphasis added).

71.     Merely alleging exposure to refractory products generally or even to NARCO refractory products is not sufficient to establish the requisite exposure to a NARCO asbestos-containing product, as 98.5% of NARCO's refractory products contained no asbestos.

72.     To satisfy the Exposure Prong, a claimant (or a person representing the claimant's estate) will typically submit an affidavit detailing the claimant's alleged exposure to a NARCO asbestos-containing product.

73.     In the prior proceedings before this Court, the Trustees and CRMC (the Trust's claims processor) acknowledged that "each Trust requires totally different exposure evidence," 8/4/15 Tr. 236:19-24, and that the exposure requirements for the NARCO Trust are "more stringent than other trusts."  8/3/15 Tr. 64:20-22; 8/4/15 Tr. 149:17-20, 348:6-10.  That is

consistent with the fact that the NARCO § 524(g) Trust is *sui generis* and unlike other asbestos bankruptcy trusts.

### E.    Expedited and Individual Review

74.    Claims can be submitted under two different tracks of review - referred to as "Expedited Review" and "Individual Review" - that each have different requirements and levels of compensation.

75.    Under the TDP, Expedited Review "is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all claims that can be easily verified by the NARCO Asbestos Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level." TDP § 4.3(a)(1).

76.    As this Court has explained, "[i]n broad terms, claims filed under the Expedited Review process are subject to an 'expeditious' and 'less burdensome' approval and if approved can result in payments of a fixed but relatively modest amount depending on the disease level involved." 12/16/15 Order at 6, Misc. Case No. 15-00204-TPA (Dkt. 265). The "scheduled" amounts range from $1,200 to $75,000, depending on the nature of the claimant's asbestos-related disease.

77.    In the Individual Review process, by contrast, claims "are subject to a more probing inquiry but can result in a much larger payment if granted." 12/16/15 Order at 6-7, Misc. Case No. 15-00204-TPA (Dkt. 265). Critically, a claimant seeking Individual Review must demonstrate "extenuating circumstances that he or she believes warrant a liquidated value above the applicable Scheduled Value." TDP § 4.3(b)(1). The TDP provides that the review of such claims involves a "detailed examination and valuation process." *Id.*

78.    The TDP sets forth a series of factors that the Trust must consider in evaluating claims submitted through the Individual Review process, including (among many others) a

claimant's age, employment status, and the extent to which the claimant offers evidence that his damages were due to asbestos exposure.

79.     These TDP provisions underscore the rigor of the Individual Review process, as well as the rigor of the TDP more generally.

80.     In the IR process, the Trust may award a claimant more than the Scheduled Values available in the ER process, subject to certain caps.  But, the Trust may also award less, depending upon the strength of the claims.

81.     For both Expedited Review *and* Individual Review, the claimant must establish a "valid" claim and must satisfy both the Presence and Exposure Prongs.

## V.
## THE TRUST'S BREACHES OF THE TRUST AGREEMENT, THE TDP, AND THE STIPULATION AND ORDER

82.     In 2015, Honeywell filed a lawsuit challenging various aspects of the Trust's operations and moved for a preliminary injunction.  This Court denied Honeywell's motion for a preliminary injunction, in part on a finding that Honeywell could not show irreparable harm because the Trust voluntarily reversed its approval of most of the claims that were the subject of the Hearing.  However, the Court expressed disapproval about how the Trust was conducting itself, stating:  "[a]lthough the Court is finding in favor of the Trust in this discrete matter, this result should by no means be viewed as an endorsement of all of its actions to date.  Some of the evidence that was presented . . . did not reflect well on the Trustees' execution of their duties in implementing the Trust."  12/16/15 Order at 33, Misc. Case No. 15-00204-TPA (Dkt. 265).  The Court further observed, among other things, that "the Trustees seemed to farm out their fiduciary obligations," and "at the very least the Trust's actions were sloppy."  *Id.*

83.     The Trust promised this Court that it would change some of its practices, both to avoid further litigation and in recognition of the fact that these practices were highly suspect.

84.    First, the Trust made a "voluntary agreement to stop accepting certain 'check the box' or 'form' affidavits as sufficient to support a claim." 12/16/15 Order at 10, Misc. Case No. 15-00204-TPA (Dkt. 265). Second, following some encouragement from the Court, the Trust executed the Stipulation and Order in March 2016, in which it agreed not to use a blanket "refractory inference" in determining exposure to a NARCO asbestos containing product.

85.    Two and a half years after the Court's preliminary injunction decision, the Trust began to breach those commitments it made to Honeywell and to the Court.

86.    As issues have arisen, Honeywell has diligently raised them with the Trust through letters and other communications, some of which are detailed below. But Honeywell was met with the same "bunker mentality" that this Court observed in 2015 in the context of the preliminary injunction proceedings. 12/16/15 Order at 34, Misc. Case No. 15-00204-TPA (Dkt. 265).

87.    The issues raised by this Complaint are not new to the asbestos trust industry. The Department of Justice ("DOJ") has observed that "alarming evidence has emerged of fraud and mismanagement inside asbestos trusts." "Justice Department Files Statement of Interest in New Asbestos Trust Proposal," The United States Department of Justice, Sept. 13, 2018, available at: https://www.justice.gov/opa/pr/justice-department-files-statement-interest-new-asbestos-trust-proposal. "Both courts and commentators have observed that a significant number of asbestos claimants . . . have provided conflicting and/or inaccurate information regarding the asbestos products to which they were exposed." DOJ Statement of Interest, Dec. 28, 2020, available at https://www.justice.gov/opa/pr/justice-department-files-statement-interest-urging-transparency-compensation-asbestos-claims. In *In re: Garlock Sealing Technologies, LLC*, No. 10-31697 (Bankr. W.D.N.C. 2014), the Court uncovered serious problems in asbestos litigation

and bankruptcy trusts, holding that "settlement history data does not accurately reflect fair settlements because exposure evidence was withheld." *Id.* at 94. Though the DOJ and at least one Bankruptcy Court have recognized the problems of fraud in the asbestos trust context, the NARCO Trust has turned a blind eye. The facts alleged herein raise similarly serious questions about the maladministration of the NARCO Trust.

88.     Given Honeywell's financial stake in the operation of the Trust, the Trust's refusal to abide by its commitments to this Court and the Stipulation and Order, and following the failure of protracted negotiations aimed at bringing a global, final resolution to the parties' ongoing disputes, Honeywell has been left with no choice but to bring the Trust's reversals and breaches to the Court's attention to seek appropriate relief. The following sub-sections detail the Trust's breaches of the Trust Agreement, the TDP, and the Stipulation and Order, its abuses of discretion, and its improper expenditure of Trust resources.

## A.     The Trust's Reversal of its Prohibitions on the Use of Form and Check-the-Box Affidavits Violates the TDP

89.     Certain law firms improperly use "form", pre-printed affidavits for numerous claimants that contain the same boilerplate language to describe the affiants' alleged exposure to a NARCO asbestos-containing product.

90.     The use of form affidavits presents a significant red flag as to whether the affidavits are truly based on the affiants' personal knowledge, and whether they truly reflect each affiant's recollection and exposure experience. It is simply not credible that hundreds, and in some cases thousands, of affiants had the identical exposure experience - not to mention the identical recollection of that experience - that their form affidavits otherwise purport to indicate, particularly when they worked at different sites, for different companies, in different occupations, in different industries, and in different time periods.

91. Honeywell provided the Trust with nearly 1,500 examples in which a NARCO affiant signed a form affidavit that purported to provide a detailed account of the claimant's alleged exposure to a NARCO asbestos-containing product, only to be contradicted in a deposition the same affiant gave in a tort lawsuit. In many cases, the form affidavit and the deposition were sworn at around the same time, and nearly always involved the same law firm representing the claimant in both the tort action and the Trust filing.

92. Reprinted below is one example of a "form" affidavit submitted to the NARCO Trust by the Law Office of Peter T. Nicholl (hereinafter, "Form Firm 1"). Form Firm 1 has submitted thousands of form affidavits to the NARCO Trust that contain the same (or similar) pre-printed, boilerplate form exposure paragraph as quoted below:

> I had exposure on a regular basis from 1962 to 1977 to Narcolite Refractory Cement. This product was used on the boilers and the furnaces. It was a cement-like product which was a dry, powdery material that came in large bags. The bags had the names "Narco" and "Narcolite" written on them. I recall seeing Narcolite used in the mills and being exposed to the dust from this product during the years from 1962 to 1977. It was used on furnace repair and rebuild jobs, as well as on boiler work during maintenance, repair and construction. The Narco cement bags I observed had the name "Narco" and a large drawing of an Indian's head on them. This Narco cement was poured from the bags into pails or troughs and created a lot of dust in the air which traveled throughout the worksite. I was present in these work areas and I breathed this dust throughout this time frame on a regular basis.

93. Form Firm 1 used this same form and exposure language for thousands of claimants - regardless of the job site, occupation, or year of alleged exposure. For example, it filed substantially identical form affidavits reflecting the same exposure, for a "rigger" and an "electrician, driver and oiler" at the Norfolk Naval Shipyard, despite the fact that these are very different jobs. Similarly, it filed substantially identical form affidavits for an "electrician," a

"material clerk," and a "sheet metal mechanic worker" at the Newport News Shipyard despite

the fact that these are also very different jobs.  It also filed identical form exposure affidavits for

a "paper maker" at International Paper, a "forklift operator" at W.R. Grace, and a "boiler

worker" who worked at Baltimore Gas & Electric.  Each one purported to have the identical

exposures and identical recollection of that exposure.

94.    Indeed, each of these Form Firm 1 claimants also had (i) exposure to the same

NARCO product (*i.e.*, Narcolite), and (ii) an identical and very specific recollection that "[t]he

NARCO cement bags I observed had the name 'NARCO' and a large drawing of an Indian's

head on them."  That thousands of Form Firm 1's clients manage to recall the specific NARCO

product by name (*i.e.*, Narcolite) and even the "Indian head on them" seems all the more

implausible given that Judge Fitzgerald's finding in confirming the NARCO Plan that the

overwhelming majority of claimants could not even name NARCO.  Revised Findings of Fact

and Conclusions of Law (*In re N. Am. Refractories Co.*, No. 02-20198-TPA [Docket No. 5507],

Ex. 1 ¶¶ 73-74 (Bankr. W.D. Pa. Dec. 28, 2006)).

95.    During the 2015 Hearing, Honeywell raised these precise form affidavits from

Form Firm 1 with the testifying witnesses and the Court.  Wetherald, 8/3/15 Tr. 86:2-87:19;

Metzfield, 8/4/15 Tr. 259:11-260:10.   They were among the precise type of affidavits that the

Trust later removed from its "to be paid pile" pending the Court's decision, with the Trust

subsequently deciding to treat them as "deficient."  But, the Trust has since completely reversed

itself; it is paying the very same type of affidavits it previously deemed deficient.

96.    Another issue Honeywell has encountered in auditing claims is "check-the-box"

affidavits, which contain pre-printed, boilerplate language that parrots the TDP's exposure

requirements, next to which there is a box in which the affiant places an "X" or "✓" or his/her initials.

97.     Like form affidavits, these "check-the-box" affidavits are formulaic and are submitted to the Trust on behalf of claimants who necessarily had different exposures at different job sites and in different occupations.  These affidavits do not describe "how" the person was exposed, other than in conclusory language that merely parrots the TDP.

98.     The following is a typical example of a check-the-box affidavit submitted to the Trust.  It parrots the TDP's exposure language word-for-word, and the affiant simply marks certain boxes on the form:

_____ worked at the above named sites, He/she:  (initial one or more of the following):

_____                    a.  Worked on a regular basis with a NARCO
                                        asbestos-containing product

or

_____                    b.  Worked on a regular basis in close proximity to
                                        workers who:
                                            i. Fabricated NARCO asbestos-containing
                                               products or
                                            ii. Installed, altered, repaired, removed or
                                                otherwise worked with a NARCO Asbestos
                                                containing product.

99.     As another example, the below affidavit attempts to satisfy a separate but related TDP requirement that the claimant have "significant occupational exposure":

I have been exposed to asbestos in the following ways, as designated by an "X":

_____ (i)         I have handled raw asbestos fibers on a regular basis

_____ (ii)        I have fabricated asbestos-containing products and through that fabrication process was exposed on a regular basis to raw asbestos fibers.

_____ (iii)       I have altered, repaired, or otherwise had hands-on exposure to an asbestos-containing product and was exposed on a regular basis to asbestos fibers

_____ (iv)        I was employed in an industry or occupation such that I worked on a regular basis in close proximity (25-50 ft) to workers who did one or more of the above three activities and as such I was exposed on a regular basis to asbestos fibers

100.    The Trust's acceptance of form and check-the-box affidavits violates the Trust Agreement and TDP because such affidavits do not reflect "competent" and "credible" evidence of exposure necessary to create a "valid" claim.  TDP § 4.7(b)(1).

101.    Like form affidavits, check-the-box affidavits are neither "competent" nor "credible" evidence of exposure to a NARCO asbestos-containing product because, among other reasons, (a) it is entirely implausible that thousands of claimants who worked at different job sites, in different roles, and at different times, would have the exact same (word-for-word) exposure and/or recollection of their claimed exposures;  (b) they fail to indicate how the exposures took place;  and (c) they raise obvious questions as to whether they reflect the claimant's own personal knowledge and true and accurate recollections.

>    i.    The Trust Previously Admitted that Form and Check-The-Box Affidavits
>          Are Deficient

102.    It is not just Honeywell who believes that these form and check-the-box affidavits

violate the Trust Agreement and TDP.  During and after the Hearing, Trust representatives

themselves repeatedly agreed with this very point, assuring both Honeywell and the Court that it

was no longer accepting such affidavits.  For example:

> (i) Trustee Gleason provided a declaration stating that "Counsel for the Trust also
> committed at the PI Hearing that no payments or offers would be made on any claims
> based solely on 'check-the-box' affidavits regardless of the Court's ruling on the PI
> Motion."  Decl. of Mark Gleason, dated Dec. 23, 2015, ¶ 34 (Dkt. 271).

> (ii) Trustee Kawaichi testified that form affidavits "are deficient at this point."  Kawaichi,
> 8/4/15 Tr. 361:16-18.

> (iii) Melissa Metzfield, President of the Trust's claims processor (CRMC),
> testified that she agreed that check-the-box affidavits should not be paid.  See Metzfield,
> 8/4/15 Tr. 254:23-255:4.

103.    On the question of the propriety of form affidavits, the Court advised the Trust's

lead counsel at the closing arguments:  "I think it's good that you got rid of it, because I don't

think that meets the burden that you - or I think that is potentially an abuse of discretion."  Nov.

23, 2015 Tr., at 128:12-129:16 (emphasis added); see also testimony of CRMC's Melissa

Metzfield, 8/4/15 Tr. 260: 7-10 ("Q:  If they are standard [form affidavits], you agree with the

Court that they should not be paid as well, correct?  A:  Of course I do.");  Wetherald Dep. Tr.

106:12-107:1 (admitting that check-the-box affidavits are deficient "because they fail[] to

describe how the claimant worked with refractory products," and noting that it is not enough to

say "they worked with or around a NARCO asbestos-containing product," but that there must be

"a further description of how that work was performed.").

104.    Even the Trust's outside general counsel acknowledged in a letter, albeit some

months after the Hearing, that "[i]n the form [affidavit] context, the concern is that claimants

blindly will sign affidavits without personalization," and that check-the-box affidavits are
likewise problematic because they "prevent the claimant from using his own language to
describe exposure." (Ltr. from S. Esserman, dated Mar. 11, 2016.)

105.    In its post-Hearing brief, the Trust made clear that it would treat these affidavits
as "deficien[t]," regardless of whether they were already in the claims process:

> Following the Court's directive, however, the Trustees determined not to
> pursue grandfathering of those claims but instead to issue deficiencies,
> allowing the Claimants to address the deficiencies. Some of those claims
> relied upon pure "check-the-box" exposure affidavits without other
> supporting evidence. Another group used "conditional" language in their
> affidavits without more, while other claims employed rote or "form"
> affidavits. The Trustees will not make offers or pay claims for which
> deficiencies have been sent until such deficiencies are addressed. *Narco
> Settlement Trust's Post-Hearing Mem. of Law in Opp'n to Honeywell's
> Motion for a Preliminary Injunction* at 7, No. 15-00204-TPA [Doc. No.
> 208] (Bankr. W.D. Pa. Sept. 18, 2015).

106.    The Court in its preliminary injunction decision thus memorialized that the Trust
had made a "voluntary agreement to stop accepting certain 'check the box' or 'form' affidavits
as sufficient to support a claim." 12/16/15 Order at 10, Misc. Case No. 15-00204-TPA (Dkt.
265).

107.    In February 2016, the Trust enacted a set of written directives, which, among
other things, codified the Trust's new prohibition on form and check-the-box affidavits in written
"Exposure Directives." The Trust posted these February 2016 Directives to its website in April
2016 (with some modifications not relevant to any of the directives discussed in this Complaint).
Honeywell objected to some of the February 2016 Directives, but on balance saw them as a step
in the right direction.

108.    In its February 2016 Directives, critically, the Trust expressly acknowledged that
form and check-the-box affidavits "*represent evidence that raises competence and/or credibility
concerns*" and must not be accepted.

27

109.    Specifically, Directive 7(a) of the February 2016 Directives, which addressed form affidavits, stated that "[t]he claims reviewer shall not consider exposure allegations that use identical descriptive language as the language highlighted in the exposure affidavit(s) attached hereto as Exhibit B (as may be supplemented from time to time)."

110.    The Trust later supplemented Exhibit B to include dozens more form affidavits, including the same form affidavits at issue from Form Firm 1.

111.    Directive 7(c) addressed check-the-box affidavits, stating that "[t]he claims reviewer shall not consider exposure allegations that use a 'check-the-box' format substantially similar to the language highlighted in the exposure affidavit(s) attached hereto as Exhibit D."

112.    Directive 7(f) addressed claimants who claim that they were in contact with asbestos-containing products on a "regular basis," or work in "close proximity" to those who work with asbestos-containing products, by simply parroting the language of the TDP.  It made clear that "[t]he claims reviewer shall not consider exposure allegations that simply copy, word for word, the exposure criteria listed in the claim form or exposure language of the TDP."

> ii.    *The Trust Later Reversed its Policies and February 2016 Directives Relating to Form and Check-the-Box Affidavits and Affidavits That Merely Parrot the Exposure Standard of the TDP*

113.    Over a year later, however, the Trust reversed course.  It changed the above-quoted February 2016 Trust Directives, and thereby broke the promises it made to Honeywell and this Court.  It also violated the Stipulation and Order.

114.    On November 28, 2017, the Trust issued a policy change, stating now that "the claims reviewer may consider exposure allegations in 'check-the-box' format to determine if a

claimant has established Significant Occupational Exposure (if applicable)." This change was included in revised February 2018 Directives that the Trust issued.[2]

115.    As of February 1, 2018, the Trust also reversed its exposure directives relating to form affidavits, deleting the critical language in the February 2016 Directives stating that the "claims reviewer shall not consider" form affidavits and instead allowing the consideration of form affidavits.

116.    Owing to the Trust's new policy, NARCO Trust claimants can now rely on form exposure allegations to establish their exposure to a NARCO asbestos-containing product, as long as they worked on an Approved Worksite during the stipulated time frame. Because there are nearly 900 Approved Worksites, this made thousands of previously deficient form affidavits now acceptable.

117.    Finally, in its February 2018 Directives the Trust also reversed its "anti-parroting" policy, now allowing consideration of affidavits that contain language mimicking the TDP's exposure requirements: "The claims reviewer may rely on an assertion in the evidence that the injured party worked 'on a regular basis' with the NARCO asbestos-containing product or 'in close proximity to workers' who worked with a NARCO asbestos-containing product, to satisfy such requirements in the TDP."

118.    When Honeywell sought an explanation for the Trust's about-face, one of the primary reasons the Trust gave, in a December 29, 2017 email from the Trust's outside general counsel, was that other § 524(g) trusts accepted form affidavits. The Trust's outside general counsel explained that the Trust had changed its policy after considering, among other things, "the practices of other asbestos trusts that allow claimants to allege exposure in form affidavits."

---

[2] The Trust updated its directives as of January 17, 2019, making what appear to be (for now, at least) relatively minor changes. This Complaint continues to refer to these directives as the February 2018 Directives.

(This was the same counsel who only a year earlier admitted that "[i]n the form [affidavit] context, the concern is that Claimant blindly will sign affidavit without personalization.")

119.    At the Hearing, this Court specifically admonished the Trust not to rely on the practices of other trusts. During questioning of CRMC's Melissa Metzfield in the preliminary injunction proceedings, Ms. Metzfield similarly testified that the Trust had previously accepted check-the-box affidavits "because for most trusts this type of affidavit is acceptable." 8/4/15 Tr. at 236:7-8. That led to the following critical exchange with the Court:

> THE COURT: Just because it's acceptable for most trusts doesn't mean -- that's like apples and oranges though. How can you take that approach when there's specific guidelines in the TDP? How can you even say that?
>
> THE WITNESS: Well, I think I -- I'm speaking what I think the trustees were thinking at the time.
>
> THE COURT: Well, I think that's troubling --
>
> THE WITNESS: But I --
>
> THE COURT: -- that you would say just because other trusts say you can do it this trust says you can do it.

*Id.* at 236:9-18.

120.    The practices of other § 524(g) trusts, which have invited serious scrutiny for fraud and other misconduct by the DOJ and other courts, cannot replace the standard set by the TDP for this Trust.

121.    Because the Trust is again accepting affidavits that do not meet the requirements of the Trust Agreement and TDP, the Trust is breaching the Trust Agreement and TDP, and is engaging in an abuse of discretion.

**B.     The Trust Also Re-Implemented the Refractory Inference, in Violation of the Stipulation and Order**

122.    As discussed above, a central issue in the previous litigation was the Trust's instruction to its claims processor (CRMC) to accept allegations of exposure to refractory products or products in that category as sufficient to meet the TDP's requirement that a claimant prove his regular exposure to a "specific asbestos-containing product" manufactured, distributed, or sold by NARCO.  The Trust instructed CRMC to draw this inference provided the claimant worked at an Approved Worksite during the years specified in the TDP.  By the closing argument in November 2015, however, the Trust advised that it had voluntarily withdrawn the alleged blanket refractory inference, which prompted this Court to say "I applaud the Trust for doing that."   Nov. 23, 2015 Tr. at 149:4-8.

123.    On March 17, 2016, following some encouragement from this Court, the Trust signed the Stipulation and Order, wherein the Trust agreed not to use a blanket refractory inference and/or accept as sufficient "a bare assertion that the claimant worked around refractory products":

> "The Trust stipulates that the Trust will not, as a matter of blanket policy, accept a bare assertion that the claimant worked around refractory products as sufficient to meet the exposure standard under the [TDP].  Instead, the Trust will evaluate claim submissions on a case-by-case basis, considering the totality of evidence that is presented in support of the claim and drawing inferences thereon….." *Stipulation and Order*, No. 15-00204-TPA [Doc. No. 376] (Bankr. W.D. Pa. Mar. 17, 2016).

124.    The Trust has since re-instituted the blanket refractory inference, in violation of the Stipulation and Order and this promise it made to Honeywell and to this Court.

125.     One example of the Trust's return to the refractory inference, which Honeywell pointed to in a letter to the Trust, is shown in how CRMC processed Claim 1869821 in 2020. The claimant was the daughter of a chemist, who worked at Dow Chemical Company.  Unlike

the steel industry, the chemical industry is not deemed by the TDP as a "presumptive industry," meaning it is not one of the industries the TDP (or Trust) presumed workers would have substantial occupational exposure to asbestos products ("SOE") - let alone exposure on a regular basis to asbestos-containing products made, sold, or distributed by NARCO. Likewise, the father's occupation – a chemist – is not considered by the Trust to be among the "limited universe" of occupations in which the person would have been expected to have substantial exposure to asbestos (let alone to NARCO asbestos). So, while the father did work at an Approved Worksite, his employment in a non-presumptive occupation within a non-presumptive industry did not prove a likelihood that he was exposed to any NARCO asbestos-containing product on a regular basis. It proved quite the opposite: that he was likely not exposed to a NARCO asbestos-containing product.

126.     The claimant daughter attempted to address this obvious deficiency, stating that "from time to time" when there was a labor strike, her father helped out as a laborer, and in those situations "at times" he assisted in the boiler rooms. Leaving aside that any such extraordinary occurrence was the opposite of the "regularity" required by the TDP, nowhere did she identify her father's exposure to any "NARCO" products by name or otherwise, nor did her affidavit claim that her father was even exposed to a NARCO product (let alone to the 1.5% of NARCO refractory products that actually contained asbestos). NARCO was nowhere mentioned.

127.     CRMC initially (and appropriately) denied the claim as failing to establish regular exposure to a NARCO asbestos-containing product. The claimant's law firm, however, pushed back, arguing that since the claimant's father worked on an Approved Worksite that should be enough to infer the requisite exposure to a "NARCO asbestos-containing product."

32

128.    CRMC's answer should have been simple:  neither mere presence on an Approved Worksite nor (to quote the Stipulation and Order) "a bare assertion that the claimant worked around refractory products [i]s sufficient to meet the exposure standard under the [TDP]."  Instead, without receiving any additional evidence from the claimant, CRMC simply reversed itself and approved a significant payment of $244,500 to this claimant.   The claimant accepted the offer in July 2021.

129.    In another example of the Trust's improper application of the refractory inference, the Trust approved Claim 2168415, where the claimant provided the following:

> I worked for various shipping companies for almost a full year in 1967 at the Houston Docks in Houston, TX. I was a longshoreman loading and unloading ships. I had significant exposure to asbestos-containing materials, including refractory materials in powder form, during this employment. I personally picked up and stacked bags of refractory cements inside the hulls of ships, I also carried them off ships and placed them in rail cars and/or the warehouse. The bags we had to load and unload often broke and the hulls of the ships were filled with thick dust. We did not wear masks and we inhaled all the dust from these materials. I was heavily exposed to refractory materials as a longshoreman by personally handling these materials regularly.

130.    The Trust approved the above claim for payment and paid it in February 2021 - even though there was no claim of exposure to any NARCO product in the above affidavit, let alone a claim to exposure to one of the 1.5% of NARCO refractory products that contained asbestos.  It appeared sufficient for the Trust that the affiant claimed exposure to refractory products generally.  This same affidavit could have been submitted - and likely was submitted - to many asbestos trusts to claim exposure to any number of products.  There is nothing in the affidavit that justified an inference that the affiant was likely exposed on a regular basis to a NARCO product, let alone to a NARCO *asbestos*-containing product.  The NARCO worksites often overlap with many other asbestos trusts' worksite lists, thus making it unreasonable to conclude that the claimant's bare assertions of exposure even just to refractory materials likely

had to be "regular" exposure to refractory materials manufactured, sold or distributed by

NARCO (with or without asbestos).

131.    There are hundreds more examples just like the above among the paid claims

from mid-2020 through early 2021 alone.

132.    In short, the Trust's denials aside, it has in fact re-implemented the refractory

inference, in violation of the Stipulation and Order.  Indeed, 25% of claims paid in Q3 2020, Q4

2020 and Q1 2021 similarly do not allege exposure to asbestos-containing products

manufactured, sold, or distributed by NARCO; they merely contain "bare assertions that the

claimant worked around refractory products."

### C.    Material Inconsistencies in Claimants' Submissions Underscore the Dangers In Relying on Form and Check-the-Box Affidavits and on Blanket Refractory Inferences and/or Parroting Statements in Affidavits

133.    The Trust's reversal of its form and check-the-box affidavits policies and its re-

implementation of the refractory inference are particularly troubling given substantial evidence

showing that claimants are making representations to the Trust that are materially inconsistent

with representations in the cases they brought in the tort system, as well as in other submissions

they have made to the NARCO Trust.

134.    The Trust has the power, per the TDP, to require claimants to submit materials

from their other cases in the tort system.  The TDP does not, however, give Honeywell that same

ability to request a claimant's submissions in other contexts like litigations.  Nevertheless, and in

part because Honeywell is also a defendant in certain tort cases involving some of the same

claimants who submit Trust claims, Honeywell was able to collect some information that was

submitted by these same claimants in those tort cases.  Having done so, Honeywell has found

substantial and material inconsistencies in the claimants' submissions to the NARCO Trust, to

which it alerted the Trust (but to no avail).

135.    As just one example among many, the Trust paid $18,000 to Claim #1736173, based on the form affidavit submitted by the claimant's wife, "P.J.," on behalf of her deceased husband.  P.J. submitted an affidavit to the NARCO Trust stating that her husband "personally worked with asbestos-containing products including asbestos insulating cement, firebrick and similar asbestos conditioning materials."  The affiant further stated that her husband "was exposed and did breathe the asbestos dust" "from 1965 to 1989."

136.    But in an earlier deposition in another asbestos matter, P.J. admitted that she did not "have any personal knowledge of the type of work [her] husband would have performed," she did not "have any personal knowledge whether [her] husband worked with any asbestos products at all," and testified that her husband never told her that "he worked with any asbestos products during his employment career."  The same law firm was involved on behalf of the claimant before both the NARCO Trust and in the other asbestos litigation.  Thus, the contrary NARCO exposure affidavit was a fraud on the Trust, and this is precisely why claimants should not be allowed to blindly sign pre-printed form affidavits given to them by their counsel.

137.    In another example, the Trust paid $18,000 to Claim #1723341, based on the form affidavit submitted by claimant's daughter, "B.W.," on behalf of the estate of her deceased father.  B.W. submitted an affidavit to the Trust stating that her father "had been exposed to asbestos-containing refractory products and had breathed air containing particles of dust arising from such products from the years of 1967 to 1979" and further that "he would have assisted bricklayers by dumping and mixing numerous bags of the castable and gunnite materials manufactured by NARCO.  In addition, he had to remove the castable and gunnite materials manufactured by NARCO after it had been used and required to be replaced."

35

138.    Less than two years before B.W. signed her form affidavit, however, B.W. testified in a deposition in another matter that she never talked with her father while he was alive "about any of the work he did" and only knew the name of the site where he worked, not even the years.  She further testified that she did not "know any products that he may have worked around."  Once again, the law firm that was involved on behalf of the claimant before the NARCO Trust and in the other asbestos litigation was the same firm.

139.    In a third example, the Trust paid $18,000 to Claim #1733732 based on another form affidavit, this one submitted by the wife, "L.S.," on behalf of the estate of her deceased husband.  L.S. provided the Trust with a form affidavit stating that her husband "had been exposed to asbestos-containing refractory products and had breathed air-containing particles of dust arising from such products from the years of 1965 to 1979" and that:  "he would have worked in the area of the various trades removing and applying castable and gunnite materials manufactured by NARCO.  He would have been required to work on the outer walls and piping connected to the equipment insulated by castable and gunnite materials manufactured by NARCO."

140.    Several years before L.S. signed her form affidavit, however, L.S. testified in a deposition in another matter that she did not have "any knowledge of any manufacturers or suppliers" of any of the asbestos-containing products to which her husband may have been exposed.  She also testified that her husband did not discuss "what the conditions were" at his work site and at most told her that "they worked a lot."

141.    In a series of letters to the Trust, Honeywell identified the above and numerous other examples of material inconsistencies in Trust submissions and asked the Trust to investigate these matters.

142.     On April 25, 2017, Honeywell sent the Trust a letter explaining that it had

identified "affiants making statements in form affidavits that directly contradict testimony the

same affiants previously provided during depositions in other asbestos matters (in many cases,

despite being represented by the same counsel that submitted the NARCO affidavit)."

Honeywell identified 34 problematic claims as examples and "recommended that the Trust use

all the tools in its possession, including the expanded audit procedures reflected in the recently

adopted Claims Audit Program, to investigate these issues."

143.     Honeywell reiterated in its April 25, 2017 letter that "the Trust should conduct a

sampling of claims and audit across all firms that have submitted form (or check-the-box,

conditional, spousal and family member) affidavits."

144.     Thereafter, on October 5, 2017 and October 31, 2017, Honeywell provided the

Trust with 77 more examples of inconsistent form affidavits - all coming from Form Firm 1.

Honeywell's examples showed that while the affidavits all featured claimants alleging exposure

to a specific NARCO asbestos-containing product (Narcolite or Unicote), the same claimants

previously provided sworn interrogatory responses that failed to mention any NARCO product in

response to questions that asked them to identify all of their asbestos exposures.  In many cases,

those interrogatory responses were sworn to around the same time that the claimant executed

their NARCO form affidavits, and they were prepared by the same law firm.

145.     On October 18, 2017, Honeywell sent the Trust additional proof that many form

affidavits were unreliable.  This time, Honeywell pointed to newly executed affidavits that Form

Firm 1 filed to cure the form affidavits that had been previously deemed deficient by the Trust.

The new affidavits, prepared by the same affiants as the original ones, were inconsistent with

those original form affidavits in significant ways-including alleging exposure to different

products, claiming different occupations and even different years of NARCO exposure.

146.    By letter dated November 8, 2017, the Trust's counsel asked Form Firm 1 about

these deficiencies, acknowledging that the "inconsistency in product identification between the

two affidavits is troubling" and that these and other inconsistencies "raise[d] questions as to the

credibility and competence of those affidavits."

147.    But despite these professed expressions of concern and after Form Firm 1 failed

to provide a plausible explanation, the Trust continued to accept submissions containing material

inconsistencies from Form Firm 1.

148.    The problems continued, with Honeywell on March 16, 2018 sending the Trust

another letter, this time identifying 680 more examples of form affidavits from Form Firm 1 that

were contradicted by later-submitted cure affidavits.  Honeywell explained that if the Trust found

Form Firm 1 inconsistencies "troubling" when there were only 23 examples of contradictory

cure affidavits, the Trust should be far more troubled when there were (by then) 680 additional

examples that Honeywell had brought to the Trust's attention.

149.    Honeywell also pointed out that the Trust's own screenshot of claimants'

exposure information from the claim form oftentimes expressly contradicted the exposure

allegations in the claimants' previously-submitted form affidavits.  For example, a Form Firm 1

claimant (No. 1711470) claimed in his original form affidavit that he "had exposure on a regular

basis from 1962 to 1977 to Narcolite Refractory Cement."  But following submission of his

inconsistent subsequent affidavit, the Trust's screenshot of his exposure information from the

claim form now said (quite inconsistently) that he had "no NARCO" exposure from 1973 to

1979.

150.    On January 18, 2019, Honeywell sent the Trust another letter identifying an

additional 738 form affidavits submitted to the Trust that are inconsistent with interrogatory

responses and/or depositions these same affiants provided in the tort system while represented by

the same firm that represents them before the NARCO Trust.

**D.      The Trust "Audit"**

151.    In October 2017, the Trust hired an auditor (hereinafter, the "Trust Auditor") to

conduct audits on its behalf under the Trust's Claims Audit Program (the "CAP").

152.    Under the CAP, there are two types of audits:  Random Audits-conducted by the

Trust Auditor on a sample of claims-and Targeted Audits, which can be conducted for a variety

of reasons at the Trustees' discretion.

153.    Following Honeywell's letters bringing forth hundreds of examples of

inconsistent form affidavits submitted by Form Firm 1 and letters from the Trust asking the firm

to justify the "credibility and competence" of their affidavits, the Trust Auditor placed Form

Firm 1 on a Targeted Audit in March 2018.

154.    On August 10, 2018, after reviewing the audit materials collected, the Trust

Auditor wrote to Form Firm 1 asking it to address "follow up questions with respect to each

claim, where we have identified potential inconsistencies or gaps in the information provided."

155.    According to the Trust Auditor, on August 24, 2018 Form Firm 1 responded with

a letter "in which the questions posed were not sufficiently addressed, with Form Firm 1

reiterating their previous responses, with little additional information."

156.    Shortly thereafter, the Trust Auditor held a call with Form Firm 1, whereby

employees of Form Firm 1 made verbal representations to the Trust Auditor.  Surprisingly, these

verbal, undocumented representations were enough for the Trust's Auditor to resolve the issues

Honeywell, the Trust, and the Trust Auditor had raised.  The Trust Auditor concluded its audit in

express reliance on these and other representations made by Form Firm 1.

157.    For example, the following was a familiar refrain from the Trust Auditor's report:

"Documentation in the law firm files delivered to the Trust Auditor did not provide
additional support as to the reliability of the exposure information. However, discussions
with the representative of the law firm provided additional information on the
procedures…"

158.    The Trust Auditor relied on the verbal say-so of the very firm it was auditing.  It

failed to interview any claimants to verify the verbal representations the firm self-servingly

made.  It did nothing to confirm with any affiant that he/she in fact had the recollection his/her

form affidavit claimed, and that he/she did not, in the prior words of the Trust's outside general

counsel, "blindly sign" the form affidavit.  Upon information and belief, the Trust Auditor did

nothing but ask Form Firm 1 to sign a "Management Representation Letter" to memorialize its

verbal representations.  Put simply, in auditing whether Form Firm 1 claimants blindly signed

their form affidavits, the Trust Auditor ironically did just that:  it blindly relied on verbal

uncorroborated, self-serving representations made by the very firm whose credibility was being

challenged.

159.    Indeed, the Trust Auditor relied on this despite the fact that Form Firm 1 blocked

the Trust Auditor's access to critical requested information using overbroad claims of privilege

and categorically refused to answer the Auditor's specific questions on a per claim basis.  When

the Trust Auditor proposed an on-site visit to Form Firm 1's office, the firm refused that request

as well.

160.    The Trust Auditor also failed to probe why the thousands of cure affidavits that

Form Firm 1 submitted, after its initial form affidavits were deemed insufficient, all dropped any

claim of exposure to the "Narcolite" product and instead uniformly replaced that claim with a

brand new claim to exposure to "Stazon"-an entirely different product with a different use. These prior form affidavits made no mention of Stazon, but now hundreds if not thousands of claimants each suddenly recalled exposure to Stazon and "forgot" the previously alleged exposure to Narcolite.

161.     The Trust Auditor rationalized that Form Firm 1's practices were "not uncommon" and are similar to the practices of other firms.  As this Court has previously stated, however, this "other Trusts do it too" justification is not a satisfactory response.  And, as the DOJ and *Garlock* court already observed, there is rampant fraud that permeates the asbestos trust and tort system - all the more reason not to rest on the practices of other trusts who may be getting defrauded as well.

162.     Upon information and belief, the Trust Auditor also rubber-stamped payments to claimants who relied on a refractory inference.  For example, the Trust Auditor passed Claim #2052236 without issue even though the Trust paid based on the refractory inference.  The claimant named dozens of manufacturers to whose products he was exposed - except NARCO. To be sure, he listed a number of asbestos manufacturers, but NARCO was noticeably absent from his list.  And, where the claimant specifically discussed his exposure to refractory type products, the claimant did not list a NARCO product listed on the NARCO Trust's published list of NARCO asbestos-containing products.  None of this raised any red flags to the Trust Auditor.

163.     Of the approximately 1,300 Random Audit reports provided to Honeywell, the Trust Auditor concluded that only 1 claim was based on "unreliable" exposure documentation. And, the Trust Auditor was unable to determine reliability of the exposure documentation for only 19 claims total (*i.e.*, approximately 1.5 percent).  To be sure, there were instances where the Trust Auditor raised inquiries.  The problem was that the Trust Auditor simply accepted

whatever responses the audited law firm provided, even when there was no documentation to corroborate it.

> **E.     The Expansion of Presumptive NARCO Inference to Non-Presumptive Industries**

164.    The TDP specifically reinforces that NARCO has a very specialized line of products and instructs the NARCO Trust that it "shall consider that there is a limited universe of occupations in a similarly limited range of industries in which claimants are likely to have been directly or indirectly exposed to NARCO or its predecessors' asbestos-containing refractory products."

165.    Many years ago, Honeywell and the NARCO Trust agreed to a Presumptive NARCO Chart that the Trust posted on its website.

166.    The Presumptive NARCO Chart allows claimants that worked at an approved worksite, during approved years, who fall into a specified overlap of a presumptive industry and presumptive occupation, to be given a presumption or inference of NARCO exposure. These claimants are thus not otherwise required to show additional proof that they were exposed to a NARCO asbestos-containing product, but instead, are given the presumption that they were.

167.    Though the chart lists over two dozen industries that generally claimants could have worked in (e.g., "chemical", "shipyard construction/repair", and "petrochemical"), it identifies only 5 industries that would qualify for the presumption (*i.e.*, assuming the other criteria was also met - one of the limited occupations, at an approved site, during approved years). The five specific industries that are considered presumptive are "aluminum manufacturing", "electric power production", "glass manufacturing", "iron", and "steel". These industries were the only five identified in the exposure section of the TDP, albeit to prove likely and substantial occupational exposure ("SOE") to asbestos generally -not as evidence of

exposure on a regular basis to that smaller sub-set of those asbestos-containing refractory products made, sold, or distributed by NARCO.

168.    Claimants who worked in any of the non-presumptive industries do not qualify under the TDP for a presumption of substantial occupational exposure (SOE) to asbestos products generally - let alone to a presumption of regular exposure to NARCO asbestos-containing refractory products.

169.    The Trust has *de facto* amended the Presumptive NARCO Chart by allowing claimants in industries other than the five agreed to industries to be treated as if they are within one of the presumptive industries.  By doing so, the Trust has extended an inference of NARCO exposure to claimants who did not work in industries sufficient under the TDP to presume the claimant was substantially exposed to asbestos - let alone regularly exposed to NARCO asbestos.

170.    This happens where a claimant who did not work in a presumptive industry (*i.e.,* the petrochemical industry is not presumptive for NARCO) instead works in a building or department which the claimant has referred to as an "on-site power plant" in an attempt to get the NARCO Trust to treat it as a presumptive industry.  As described above, the TDP speaks to presumptive "industries" and presumptive occupations within those industries.  The TDP does not speak to "buildings" or "departments" within industries, and it certainly does not give claimants the benefit of exposure presumptions for work in "buildings" or "departments" *outside* of presumptive industries.  Nonetheless, the NARCO Trust has been treating claimants in such situations as if they worked in presumptive industries, which has in turn allowed the Trust to conclude that the claimant passed the TDP's exposure requirements based on a presumption of NARCO exposure.

171.    There are over one hundred examples amongst the claims the Trust has paid in just three quarters: Q3 2020, Q4 2020, and Q1 2021.

172.    None of these claims contain any mention of NARCO at all.

173.    This is particularly worrisome because the exposure affidavits used to support the work in the "on site power plant" are form affidavits (the Trust has identified these affidavits as being "Form").

174.    For example, in Claim #2126951, the claimant submitted Form-237 (as identified and named by the Trust).  Claimant worked at the Mobil/Exxon Refinery during the years that the site was an Approved Site.  The refinery is in the petrochemical industry but claimant states that he worked within the "on-site power-plants".  He does not mention NARCO, and in fact does not say anything else about *his* exposure.  He generally describes what power plants were in existence at the refinery and says that he remembers "his crew . . . going in to during shutdowns and turnarounds to replace the asbestos insulations and firebrick . . ."

175.    Further, the same law firm and/or the Trust's claims processor are not even consistent.  For instance, in filing or processing claims they at times mark the same worksite (properly) as petrochemical industry.  They do this when the claimant is not in a presumptive occupation, as in those cases the claimant does not stand to gain the presumption of NARCO exposure anyway.  But, when the claimant is in the presumptive occupation, they mark the same worksite as "electrical power-production", which is a presumptive industry.  Combined with the presumptive occupation, this designation allows the claimant to be entitled to the presumption of regular exposure to a NARCO asbestos containing product even though he does not work in one of the five presumptive industries recognized by the TDP or the parties in their presumptive industry chart.

44

176.    Honeywell did not consent to amending the Presumptive NARCO Chart.

177.    The Trust's unilateral expansion of the Presumptive NARCO Chart to allow an inference of exposure for workers who worked in industries outside of the "limited" number of presumptive industries agreed to by the parties and identified in the TDP is a violation of the TDP and Trust Agreement, and as such, is invalid.

### F.    The Trust's Individual Review Model is a Breach of the Trust Agreement and TDP, and Also Constitutes an Abuse of Discretion

178.    The Trust is also breaching the Trust Agreement and TDP and abusing its discretion through the Individual Review ("IR") mathematical algorithmic model (the "IR Model") that the Trust created to evaluate IR claims.

179.    As described above, the TDP contains two different forms of review:  Expedited Review ("ER") and IR.  *See* TDP § 4.3.

180.    At a high level, ER is a less involved process for claimants with corresponding lesser levels of compensation available, whereas IR involves "a more probing inquiry but can result in a much larger payment if granted."  12/16/15 Order at 6-7, Misc. Case No. 15-00204-TPA (Dkt. 265).  A claimant seeking IR must demonstrate "extenuating circumstances that he or she believes warrant a liquidated value above the applicable Scheduled Value."  TDP § 4.3(b)(1).

181.    For claimants who elect and are eligible for ER based on their disease, the Trust provides a certain fixed amount (the Scheduled Value) depending upon disease level.  *See* TDP § 2.2.

182.    Section 4.3(a)(3) of the TDP sets forth the ER Scheduled Values for the eligible disease types, which range from $1,200 for Other Asbestos Disease (Level I) to $75,000 for Mesothelioma (Level V).

45

183.    In the case of IR, the possible compensation available is both potentially higher,

or lower, depending on the presence of certain factors listed in the TDP.

184.    While the IR process is designed to compensate claimants at the "full liquidated

value for each qualifying claim," there is no fixed amount for each disease type.  TDP

§ 4.3(b)(1).  Rather, subject to certain caps, "the liquidated value of any NARCO Asbestos Trust

Claim that undergoes Individual Review may be determined to be less than the Scheduled Value

the claimant would have received under Expedited Review."  *Id.*

185.    In determining whether the "extenuating circumstances" threshold has been met

and how much compensation should be awarded to a claimant in the IR process, the TDP

requires the Trust to consider a variety of specified factors "that affect the severity of damages

and values within the tort system."  TDP § 4.3(b)(2).  In addition, the TDP states that "[t]he

NARCO Asbestos Trust shall also take the quality and persuasiveness of the claimant's exposure

evidence into account in reaching any liquidated value for each claim liquidated through the

Individual Review Process."  *Id.*

186.    In § 4.3(b)(3), the TDP sets forth, for the various disease types, the Scheduled

Values, an Average Value, and a Maximum Value.  Importantly, the TDP specifies in footnote 8

that:

> The Trustees, in evaluating these NARCO Asbestos Trust Claims, shall
> use their best efforts such that the amounts offered through Individual
> Review for each Disease Level shall annually arithmetically average the
> 'Average Value' per claim set forth herein.  However, in making the
> determination of whether the amounts offered for claims processed
> through Individual Review arithmetically average such 'Average Value,'
> the NARCO Asbestos Trust shall exclude from its computations any
> amounts that were at or below the Scheduled Value for the relevant
> Disease Levels of such claims.

The Average Values currently range from $27,475 for Other Cancer to $219,797,[3] for

Mesothelioma.  The Average Values are thus considerably higher than the Scheduled Values

available for ER claims.

187.     The Trust developed an IR Model to generate IR claim values based on the

model's various inputs.  If properly implemented, such a model should be able to identify the

claims that have "extenuating circumstances" (in which case they should receive compensation

above the Scheduled Values given to ER claimants) and those which do not (in which case they

should get Scheduled Value or less).  It should also provide greater objectivity to the valuation

process and ensure that like claims are valued similarly.

188.     However, the IR Model that was actually implemented by the Trust does none of

the above, and instead violates the Trust Agreement and TDP, and constitutes an abuse of

discretion.

189.     The Trust already knows Honeywell's specific objections to the IR Model, as

Honeywell has detailed its objections to the Trust in writing on several occasions (the "IR Model

Objection Correspondence").  The IR Model is highly confidential, and thus, Honeywell

incorporates the IR Model Objection Correspondence by reference herein.

### G.     The Trust Violated the TDP and Trust Agreement When It Unilaterally Extended the Statute of Limitations for Claimants Despite Honeywell's Objection and Without Honeywell's Consent

190.     The TDP states in Section 4.1(a)(2) that the statute of limitations on claims filed

with the Trust (subject to certain exceptions) is determined by "the applicable federal, state and

foreign statute of limitations in effect at the time of the filing with the NARCO Asbestos Trust."

It further states that the limitations period is three years from the date of diagnosis on certain

---

[3] Per TDP Section 7.2, the Average Values are adjusted every three years to account for inflation or deflation.

claims, irrespective of any relevant statute of limitations period.  Finally, it states that for the

statute of limitations to be tolled based on a filing of the claim with the Trust, it must meet the

requirements set forth in the Supplemental Notice, dated November 6, 2016 and attached to the

TDP as Exhibit B (the "Supplemental Notice").

191.    The Supplemental Notice identifies the documentation that the claimant must file

to stop the statute of limitations from running.  Recognizing that "extraordinary circumstances"

may arise, the Supplemental Notice provides an exception that will allow an individual claimant

to be excused from the bar of the statute of limitations upon his/her filing with the Trust a sworn

statement, acceptable to the Trust, that attests to the exceptional circumstances encountered and

why it prevented a timely filing and that details his/her "reasonable due diligence in response to

the claimed circumstances."

192.    The Supplemental Notice authorizes the Trust to grant exceptions only to

claimants who make the requisite sworn submission, and that exception must be done "based on

the facts of each case," and even then, only after evaluating "the individual evidence presented . .

. and the diligence exercised in curing the [document] deficiencies."

193.    In March 2020, after the COVID-19 pandemic caused certain temporary court

closures, the Trust sought Honeywell's consent to amend the TDP to extend the statute of

limitations for a few months.  Honeywell gave its consent.  After that initial period expired, the

Trust sought five more extensions, each of which Honeywell granted.  However, beginning no

later than September 2020, Honeywell made clear that it was agreeing to the extensions even

though it "disagrees . . . that any additional extension is necessary," considering that courts had

already reopened and commerce had resumed.  The last extension Honeywell agreed to was on

October 21, 2020, for a two-month extension ending December 31, 2020.

194.    In December 2020, the Trust requested Honeywell's "consent" to a sixth extension, this time through the end of February 2021.  Honeywell refused to consent to this sixth extension, telling the Trust in a December 21, 2020 letter that the Trust could instead rely on the procedures in the Supplemental Notice attached to the TDP that provide relief on a case-by-case basis, if necessary, to claimants who satisfy to the Trust that they have acted with the requisite due diligence in pursuing their claims.

195.    The Trust went ahead and implemented the sixth extension anyway, over Honeywell's objection.  Unilaterally extending the statute of limitations amended the limitations period contained in the TDP, and thus clearly violated the TDP.  Indeed, where, as here, the amendment will increase Honeywell's funding obligations to the Trust, Honeywell's right to withhold its consent was absolute, as set forth in Section 8.4 of the Trust Agreement (*see* ¶ 57, *supra*).

196.    The Trust did not deny that Honeywell's consent was necessary to extend the statute of limitations.  Rather, the Trust claimed that Honeywell's agreement to the initial extension through June 21, 2020 somehow constituted an agreement to any *additional* extension the Trust later wished to impose.  That was an absurd position for the Trust to take and the product of bad faith.  As the Trust well knew, Honeywell did not delegate to the Trust the right to unilaterally increase Honeywell's funding liability without its consent.

197.    Indeed, if the Trust already had Honeywell's consent as the Trust claimed, then it would not have needed to request Honeywell's "consent" for each of the five previous extensions.

198.    The Trust's own internal executive session meeting minutes demonstrate that the Trust in fact understood that further extensions required Honeywell's "consent."  (*See, e.g.,* Minutes of Trustees' Executive Session Meetings, Aug. 10, 2020 and Sept. 14, 2020.)

199.    The Trust's decision to extend the statute of limitations a sixth time, over

Honeywell's objection, was a flagrant, bad faith violation of the TDP.

200.    Over Honeywell's continued objections, the Trust extended the statute of

limitations three more times.

201.    The eighth extension was due to expire on June 30, 2021.  On June 4, 2021, the

Trust sent the constituents its proposal to end the extension of the statute of limitations as of June

30, 2021 (with a 14 calendar date grace period).  The Trust later moved the end date to the end of

August 2021, however, simply because one or more TAC members complained during the

quarterly meeting.

202.    Thus, the Trust implemented a ninth extension effective as of July 1, 2021 and

which just ended August 31, 2021.  These extensions have been in place notwithstanding courts

have been in session for most of that time and indeed, even as depositions, discovery, and trials

have taken place throughout the country.

### H.    The Trust Is Mismanaging Trust Assets and Engaging in Wasteful Spending

203.    Finally, the Trust is also violating the Trust Agreement and TDP and abusing its

discretion by failing to prudently manage its own expenses, resulting in Honeywell paying

millions of dollars unjustifiably.

204.    Section 3.1(c)(xi) of the Trust Agreement provides that the Trustees may "pay

employees, legal, financial, accounting, investment, audit, forecasting, and other consultants

advisors and agents *reasonable* compensation."  (emphasis added.)  Instead, the Trustees are

using Honeywell's obligation to fund the Trust as a license for profligate spending on law firms

and consultants, two of which work for a consulting firm owned and operated by one of the

Trustees.  Employing one's own firm creates an obvious conflict of interest and, at a minimum,

the appearance of impropriety, particularly where, as here, those same services could be provided

to the Trust much more cheaply through hiring full-time employees.  The Trust has been operating for the last eight years, over which time it has paid hundreds of millions of dollars in indemnity and administrative costs without ever hiring a single employee.

205.    Not surprisingly, in 2018, the administrative expenses of the NARCO Trust were nearly $20 million.  By comparison, based on data taken from annual filings of financial statements with bankruptcy courts, in 2018 the administrative expenses of fifteen other § 524(g) trusts ranged from approximately $123,000 to $9.1 million, with an average of $3.7 million.  In 2019, the administrative expenses of the NARCO Trust were approximately $15.4 million.  By comparison, in 2019 the administrative expenses of the same fifteen other § 524(g) trusts ranged from $85,000 to $8.9 million, with an average of $3.4 million.

206.    The Trust has provided no satisfactory explanation as to why its administrative expenses are orders of magnitude more than other trusts.

207.    The Trustees' fees alone are higher, or almost as high, as the *entire* administrative budgets of several other trusts.  In 2020, the Trustees paid themselves approximately $1.5 million for what is in essence part-time work.  That is, the Trustees do not work exclusively for the NARCO Trust; they sit on a number of other trusts as trustees or as the future claimants' representative, to say nothing of their other sources of income through legal or consulting work.

208.    The Trust has in particular demonstrated a complete inability and unwillingness to control its legal fees, which Honeywell is otherwise required to fund.  Outside counsel for the Trust regularly engage in duplicative and unnecessary work.  The Trustees also regularly rely on outside counsel to perform non-legal business functions relating to the administration of the Trust-work that could be done much less expensively by full-time Trust employees (which the Trust refuses to hire).

209.    In 2018 and 2019, the Trust paid approximately $21 million to the Trust's, TAC's and FCR's lawyers (including $7 million for the Trust's litigation counsel, even though there was no litigation in any of those years), plus approximately $3.3 million in total to the three Trustees over that same two-year time period.

210.    The Trustees have taken full advantage of Honeywell's obligation to pay the Trust's legal fees, forcing Honeywell to engage in unnecessary litigation.  As detailed above at length, in 2015, and after months of negotiations, Honeywell challenged various of the Trust's practices and incurred substantial litigation expense doing so, only to have the Trust concede various positions at the Hearing shortly after Honeywell brought the litigation.  These were positions that the Trust should never have taken and/or forced Honeywell to litigate.  Now, yet again, the Trust is forcing Honeywell to re-litigate policy positions on affidavits that the Trust previously committed to disallow, requiring the Trust (and thus Honeywell) to again incur more unnecessary legal fees.

211.    The Trust has also mismanaged Trust assets by insisting on employing two consultants-from one Trustee's own consulting firm (owned and named after him) – to provide day-to-day operational services *in lieu* of hiring its own full-time employees, which would cost a fraction of the amount the Trust is paying now.  From July 2016 through May 2021, the Trust has paid this Trustee's consulting firm approximately $5.5 million for the services provided by these two consultants.

212.    Honeywell has repeatedly objected to this practice:  it is improper, wasteful, creates an obvious conflict of interest and appearance of impropriety, and surrenders the Trustee's independence to the two Trustees who decide whether the self-interested Trustee will continue to receive millions of dollars in additional payments.  Indeed, the Trust has been in

operation for over eight years now, has paid approximately $523 million in claims, and despite

Honeywell's repeated requests that the Trust hire staff and employees (as they are much more

affordable than using consultants), the Trustees have refused to hire a single employee or staff

person.

213.    It raises obvious conflict of interest issues for a Trustee's consulting firm to

receive millions of dollars in additional fees from the Trust year after year, when the Trustee is

charged with the obligation of managing the Trust's assets efficiently.  At a minimum, it creates

an appearance of impropriety.

### COUNT I
### Breach of Trust Agreement and TDP - Improper Reversal of Policies on Form and Check-the-Box Affidavits and Parroting of the TDP

214.    Honeywell repeats and re-alleges each and every allegation contained in the

aforementioned paragraphs as though they were fully set forth herein.

215.    Following the 2015 preliminary injunction proceedings, the Trust committed to

no longer accept form and check-the-box affidavits, describing them as "represent[ing] evidence

that raise[s] competence and/or credibility concerns."

216.    The Trust has since gone back on its word and now accepts these affidavits.

217.    The Trust's renewed acceptance of these affidavits violates the Trust Agreement

and TDP and constitutes an abuse of discretion.  These affidavits do not reflect "competent" and

"credible" evidence of exposure necessary to create a "valid" claim any more than they did when

the Trust conceded they were "deficient" during the Hearing and rejected them in its February

2016 Directives.  TDP § 4.7(b)(1).

218.    Further, affidavits that merely parrot the language of the TDP to prove exposure

to asbestos on a "regular basis," or exposure through being in "close proximity" to others, are

53

also not "competent" and "credible" evidence of exposure necessary to create a "valid" claim.
TDP § 4.7(b)(1).

219.    That claimants have submitted form affidavits that are materially inconsistent
with representations they made in other litigations or in subsequent submissions to the Trust
underscores that these affidavits are not "competent" and "credible" evidence of exposure
necessary to create a "valid" claim.  TDP § 4.7(b)(1).

220.    Because Honeywell has an evergreen funding obligation, Honeywell has
sustained substantial damages as a result of this breach, continues to sustain such damages, and
will sustain damages going forward unless the Trust's conduct is prohibited.

221.    If this breach is not enjoined, Honeywell will continue to suffer millions of dollars
in unrecoverable and additional liability, as additional invalid claims will be paid by the Trust
based on standards that violate the TDP.

222.    Accordingly, Honeywell requests that the Court declare that form affidavits and
check-the-box affidavits violate the Trust Agreement and TDP, and enjoin the Trust from
accepting them as credible and competent evidence of exposure.  The Court should further
declare that Honeywell is not required to pay claims founded upon form or check-the-box
affidavits.  Finally, the Court should require the Trust to revert to its February 2016 directives as
it relates to form, check-the-box, and parroting affidavits.

**<u>COUNT II</u>**
**Breach of the Stipulation and Order - Reinstitution of the Blanket Refractory Inference**

223.    Honeywell repeats and re-alleges each and every allegation contained in the
aforementioned paragraphs as though they were fully set forth herein.

224.    The Stipulation and Order the Trust executed in 2016 barred the Trust from

relying on a blanket refractory inference to establish the requisite exposure to a NARCO

asbestos-containing product.

225.    In violation of that Stipulation and Order, the Trust re-instituted a blanket

refractory inference.

226.    Because Honeywell has an evergreen funding obligation, Honeywell has

sustained substantial damages as a result of this breach, continues to sustain such damages, and

will sustain damages going forward unless the Trust's conduct is enjoined.

227.    If this breach is not enjoined, Honeywell will continue to suffer millions of dollars

in unrecoverable and additional liability, as additional invalid claims will be paid by the Trust

based on standards that violate the Stipulation and Order, all of which Honeywell cannot recover.

228.    Accordingly, Honeywell requests that the Court enjoin the Trust from continuing

to use its blanket refractory inference, in violation of the Stipulation and Order, the TDP, and the

commitments the Trust made to this Court and Honeywell.

### COUNT III
**Breach of Trust Agreement and TDP - Acceptance of Exposure Evidence Containing
Material Inconsistencies**

229.    Honeywell repeats and re-alleges each and every allegation contained in the

aforementioned paragraphs as though they were fully set forth herein.

230.    The Trust has accepted affidavits from claimants whose claim files contained

material inconsistencies with the claimants' representations in other exposure submissions to the

Trust.

231.    The Trust's acceptance of affidavits containing material inconsistencies violates

the Trust Agreement and TDP and constitutes an abuse of discretion because these affidavits do

not reflect "competent" and "credible" evidence of exposure necessary to create a "valid" claim. TDP § 4.7(b)(1).

232.     Because Honeywell has an evergreen funding obligation, Honeywell has sustained substantial damages as a result of this breach, continues to sustain such damages, and will sustain damages going forward unless the Trust's conduct is prohibited.

233.     If this breach is not enjoined, Honeywell will continue to suffer millions of dollars in unrecoverable and additional liability, as additional invalid claims will be paid by the Trust based on standards that violate the TDP.

234.     Accordingly, Honeywell requests that the Court declare that the Trust cannot accept affidavits that are materially inconsistent with representations made by the same claimants and that Honeywell is not be required to pay for such claims.

235.     Additionally, the Court should order the Trust to request from claimants filings made in other matters as part of the ER Claim Form so that the Trust can identify instances where the exposure allegations made to the Trust are inconsistent with allegations the same claimants are making elsewhere.

## COUNT IV
**Breach of Trust Agreement and TDP - IR Model**

236.     Honeywell repeats and re-alleges each and every allegation contained in the aforementioned paragraphs as though they were fully set forth herein.

237.     The Trust Agreement and TDP call for two different types of claims review, Expedited Review (ER) and Individual Review (IR).

238.     The Trust's IR Model is in breach of the Trust Agreement and TDP and constitutes an abuse of discretion.

239.    A claimant seeking IR must demonstrate "extenuating circumstances that he or

she believes warrant a liquidated value above the applicable Scheduled Value."  TDP § 4.3(b)(1).

240.    For reasons discussed in the IR Model Objection Correspondence, the Trust's IR

Model breaches the Trust Agreement and the TDP.

241.    Because Honeywell has an evergreen funding obligation, Honeywell has

sustained substantial damages as a result of this breach, continues to sustain such damages, and

will sustain damages going forward unless the Trust's conduct is enjoined.

242.    If this breach is not enjoined, Honeywell will continue to suffer millions of dollars

in unrecoverable and additional liability and Honeywell cannot recover the amounts paid.

243.    Accordingly, Honeywell requests that the Court declare that the Trust's IR Model

constitutes a breach of the Trust Agreement and TDP and an abuse of discretion, and order the

Trust to develop an appropriate IR Model.  Honeywell further requests that the Court declare that

Honeywell is not required to pay claims generated by an invalid IR Model.

## COUNT V
**Breach of Trust Agreement and TDP - Expansion of Presumptive NARCO Inference to
Non-Presumptive Industries**

244.    Honeywell repeats and re-alleges each and every allegation contained in the

aforementioned paragraphs as though they were fully set forth herein.

245.    The TDP specifically reinforces that NARCO has a very specialized line of

products and instructs the NARCO Trust that it "shall consider that there is a limited universe of

occupations in a similarly limited range of industries in which claimants are likely to have been

directly or indirectly exposed to NARCO or its predecessors' asbestos-containing refractory

products."

246.    Many years ago, Honeywell and the NARCO Trust agreed to a Presumptive

NARCO Chart that the Trust posted on its website.

247.    The Presumptive NARCO Chart allows claimants that worked at an approved worksite, during approved years, who fall into a specified overlap of a presumptive industry and presumptive occupation, to be given a presumption or inference of NARCO exposure.

248.    The chart identifies only 5 industries that would qualify for the presumption. The five specific industries that are considered presumptive are "aluminum manufacturing", "electric power production", "glass manufacturing",  "iron", and "steel".

249.    The Trust has *de facto* amended the Presumptive NARCO Chart by allowing claimants in industries other than the five agreed to industries to be treated as if they are within one of the presumptive industries.

250.    There are over one hundred examples amongst the claims the Trust has paid in just three quarters: Q3 2020, Q4 2020, and Q1 2021.

251.    None of these claims contain any mention of NARCO at all.

252.    Further, the exposure affidavits supporting these claims are "form affidavits."

253.    Honeywell did not consent to amending the Presumptive NARCO Chart.

254.    The Trust's unilateral expansion of the Presumptive NARCO Chart to allow an inference of exposure for workers who worked in industries outside of the "limited" number of presumptive industries agreed to by the parties and identified in the TDP is a violation of the TDP and Trust Agreement, and as such, is invalid.

255.    Accordingly, Honeywell seeks an order enjoining the Trust from continuing to misapply the Presumptive NARCO Chart and from taking a blanket inference of exposure to NARCO asbestos-containing products on a regular basis based on work outside of the limited number of presumptive industries identified in the TDP and agreed to by the parties.

256.     Honeywell also requests that the Court declare that Honeywell is not required to pay claims that benefited from the Trust's inappropriate expansion of the Presumptive NARCO Chart.

## COUNT VI
### Breach of Trust Agreement and TDP - Extension of the Statute of Limitations

257.     Honeywell repeats and re-alleges each and every allegation contained in the aforementioned paragraphs as though they were fully set forth herein.

258.     As discussed above, the Trust unilaterally, and over Honeywell's objections, extended the statute of limitations four times since December 31, 2020.

259.     The Trust's extensions of the statute of limitations were not permissible, as consent was required to amend the TDP and under Section 8.4 of the Trust Agreement.

260.     Honeywell never consented to any extension after the one expiring on December 31, 2020.

261.     Accordingly, Honeywell requests that the Court declare that the sixth, seventh, eighth, and ninth extensions of the statute of limitations were in violation of the TDP and Trust Agreement;  and enjoin the Trust from granting any additional extensions.

## COUNT VII
### Breach of Trust Agreement and TDP - Misuse of Trust Funds

262.     Honeywell repeats and re-alleges each and every allegation contained in the aforementioned paragraphs as though they were fully set forth herein.

263.     The Trust is also violating the Trust Agreement and TDP, including but not limited to Section 3.1(c)(xi) and (xiv) and Section 3.2 of the Trust Agreement, by engaging in an abuse of discretion, and breaching its contractual duties through its failure to manage its own expenses in good faith and reasonably.

264.     The Trust's budget is excessive and unwarranted; it is not a proper use of Trust funds.

265.     The Trust also has otherwise failed to control its outside counsel fees, leading to duplicative work and improper and excessive legal fees.

266.     Further, the Trust has mismanaged Trust assets by, for five years, employing two consultants from one of the Trustee's own consulting firm to provide day-to-day operational services.  These services could be provided at lower cost elsewhere and the Trust's employment of consultants from a firm run by one of the Trustees presents a conflict of interest.

267.     In addition to excessive fees, continued employment of a Trustee's own consulting firm creates the appearance of impropriety, undermines the integrity of the asbestos trust system, causes that Trustee to lose his independence, and improperly disincentivizes him to exercise independent judgment to take positions that are at odds with those championed by one or more of the Trustees who have approved the use of his consulting firm and approved the millions of dollars of fees the Trust has paid to the firm already.

268.     Because Honeywell has an evergreen funding obligation, Honeywell has sustained substantial damages as a result of this breach, continues to sustain such damages, and will sustain damages going forward unless the Trust's conduct is enjoined.

269.     If this breach is not enjoined, Honeywell will continue to suffer millions of dollars in unnecessary and improper administrative and legal fees.

270.     Honeywell requests that the Court declare that the Trust has violated its contractual duties and abused its discretion by mismanaging its expenses;  further declare that the Trust's payment to a Trustee's own consulting firm creates a conflict of interest;  and enjoin the Trust from the continued employment of the consulting firm owned by one of the Trustees.

## COUNT VIII
## Declaratory Judgment

271.    Honeywell repeats and re-alleges each and every allegation contained in the

aforementioned paragraphs as though they were fully set forth herein.

272.    In light of the foregoing breaches, the Court should issue a declaratory judgment

declaring, among other things:

   a.    The Trust's allowance of form, check-the-box and parroting affidavits violates the Trust Agreement and TDP and constitutes an abuse of discretion.

   b.    The Trust has re-implemented a blanket refractory inference, in violation of the Stipulation and Order and the commitments the Trust made to this Court and to Honeywell.

   c.    The Trust's allowance of affidavits containing material inconsistencies with representations made by the same claimant in its filings with the Trust violates the Trust Agreement and TDP and constitutes an abuse of discretion.

   d.    The Trust's IR Model violates the Trust Agreement and TDP and constitutes an abuse of discretion.

   e.    The Trust has violated the TDP and Trust Agreement by expanding the Presumptive NARCO Chart and allowing claimants outside of the five specified industries to be granted a presumption of NARCO exposure.

   f.    The Trust has violated the TDP and Trust Agreement by extending the statute of limitations over Honeywell's objection and without Honeywell's consent.

   g.    The Trust has violated the Trust Agreement and TDP and abused its discretion in its mismanagement of Trust expenses and legal fees and in perpetuating a conflict of interest.

   h.    Honeywell is not required to pay or fund claims and/or Trust expenses and legal fees that are premised on the Trust's above breaches of the Trust Agreement and TDP or that constitute abuses of discretion.

## PRAYER FOR RELIEF

WHEREFORE, Honeywell prays that this Court enter judgment in its favor on
each and every Count and award Honeywell relief, including, but not limited to:

1.    Ordering the Trust to comply with the Trust Agreement and TDP as requested
      herein;

2.    Permanently enjoin and order the Trust to no longer accept form, check-the-box,
      and parroting affidavits - and to treat these affidavits as deficient;

3.    Permanently enjoin and order the Trust to no longer allow a blanket refractory
      inference, in violation of the Stipulation and Order;

4.    Permanently enjoin and order the Trust to not accept affidavits that contain
      material inconsistencies when compared to representations made by the same
      claimant in other filings with the Trust;

5.    Permanently enjoin and order the Trust to request from claimants filings made in
      other matters as part of the ER Claim Form;

6.    Permanently enjoin and order the Trust to cease its use of its current IR Model
      and devise a new IR Model that is consistent with the Trust Agreement and TDP;

7.    Permanently enjoin and order the Trust to cease allowing claimants outside of the
      five specified industries in the Presumptive NARCO Chart to be granted a
      presumption of NARCO exposure;

8.    Ordering that Honeywell is not required to pay claims, expenses and/or legal fees
      founded upon the Trust's above breaches of the Trust Agreement and TDP and
      that constitute abuses of discretion;

9.    Permanently enjoin and order the Trust to refrain from any further extensions of the
      statute of limitations absent Honeywell's consent;

10.   Permanently enjoin and order the Trust to discontinue utilizing the services of the
      consulting firm of one of its Trustees;

11.   Declaring the parties' rights and obligations as set forth in Count VIII; and

12.   Ordering any other relief that the Court may deem just and proper.

Dated: September 15, 2021

KIRKLAND & ELLIS LLP

Craig S. Primis, P.C.
(*pro hac vice* application forthcoming)

Ronald K. Anguas, Jr.
(*pro hac vice* application forthcoming)

1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Mark McKane, P.C.
(*pro hac vice* application forthcoming)

555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

Nicole L. Greenblatt, P.C.
(*pro hac vice* application forthcoming)

601 Lexington Avenue
New York, NY 10022
Telephone: (202) 446-4800

MCDERMOTT WILL & EMERY LLP

Peter John Sacripanti
NY State Bar No. 1970581
NJ State Bar No. 026281984
D.C. Bar No. 414801
(*pro hac vice* application forthcoming)

John J. Calandra
NY State Bar No. 2473601
(*pro hac vice* application forthcoming)

One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

QUINN, BUSECK, LEEMHUIS, TOOHEY & KROTO, INC.
*/s/Michael P. Kruszewski*
Michael P. Kruszewski
(Pennsylvania Supreme Court ID #91239)

Arthur D. Martinucci
(Pennsylvania Supreme Court ID #63699)

2222 W. Grandview Blvd.
Erie, Pennsylvania 16506
Telephone: (814) 833-2222
Facsimile: (814) 833-6753
amartinucci@quinnfirm.com
mkruszewski@quinnfirm.com

*Attorneys for Honeywell International Inc.*